952 So.2d 393 (2005)
James BARBER
v.
STATE of Alabama.
No. CR-03-0737.
Court of Criminal Appeals of Alabama.
May 27, 2005.
Rehearing Denied July 8, 2005.
Certiorari Denied September 22, 2006.
*400 Benjamin L. Boyanton, Huntsville; Lajuana Sharonne Davis, Montgomery; and Robert B. Tuten, Huntsville, for appellant.
Troy King, atty. gen., and Tracy Daniel and Corey L. Maze, asst. attys. gen., for appellee.
Alabama Supreme Court 1041603.
BASCHAB, Judge.
The appellant, James Barber, was convicted of one count of capital murder for the killing of Dorothy Epps. The murder was made capital because the appellant committed it during the course of a robbery or an attempted robbery. See § 13A-5-40(a)(2), Ala.Code 1975. After a sentencing hearing, by a vote of 11 to 1, the jury recommended that the appellant be sentenced to death. The trial court followed the jury's recommendation and sentenced the appellant to death. The appellant filed two motions for a new trial, which the trial court denied. This appeal followed.
The appellant does not challenge the sufficiency of the evidence to support his conviction. However, we have reviewed the evidence, and we find that it is sufficient *401 to support the appellant's conviction. The following summary of the relevant facts, as prepared by the trial court, may be helpful to an understanding of this case:
"Dorothy Epps was seventy-five years old at the time of her death, weighed approximately 100 pounds, and was 5 feet 5 inches tall. She was murdered on or about May 20th or May 21st, 2001, at her home in Harvest, Alabama.
"The Defendant knew Mrs. Epps during her lifetime, had done repair work at the Epps home, and had had a social relationship with one of Mrs. Epps' daughters. There was no evidence of a forced entry by the Defendant into the Epps home, and it is more likely than not that the Defendant gained access to the home easily because of his acquaintance with Mrs. Epps.
"Based upon the physical evidence presented including photographs of Mrs. Epps, before and during the autopsy, photographs of the area of the home where Mrs. Epps' body was found, and based upon the videotaped confession of the Defendant, the Defendant first struck Mrs. Epps in the face with his fist, and at some point thereafter, obtained a claw hammer that he used to cause multiple blunt force injuries to Mrs. Epps which caused her death.
"Dr. Joseph Embry, a medical examiner with the Alabama Department of Forensic Sciences, testified as to his findings from the autopsy he performed on May 23rd, 2001.
"Dr. Embry's examination of the body of Dorothy Epps showed injuries that he classified in several different categories: bruises, cuts and fractures, bleeding over the brain, multiple injuries in hand and arms, rib fractures and bruising in the front of her body, and bruising and rib fractures in the back of the body.
"Dr. Embry found evidence of nineteen different lacerations in the head and seven fractures in the head or skull, injuries to the neck and mouth and left eye caused by blows to Mrs. Epps by the Defendant's fists, and her tongue was bruised and injured from a blow or blows to the head.
"Numerous defensive wounds were found by Dr. Embry, which were obviously inflicted upon Mrs. Epps in her effort to try to ward off the blows. She had bruising in her left palm and forearm, and bruising and injuries to the backs of her hands.
"Mrs. Epps also suffered abdominal and lower chest bruising and she had fractures of her ribs in those areas. The wounds and injuries suffered by Mrs. Epps were consistent with those that would have been inflicted with a claw hammer, according to Dr. Embry.
"Based upon his examination and his experience and training, Dr. Embry testified that the cause of death of Mrs. Epps was multiple blunt force injuries as depicted and described in his testimony, including the photographs that were admitted into evidence.
"It is obvious from the testimony and the photographs that the injuries to Mrs. Epps, inflicted by the Defendant with a claw hammer, occurred over several areas of the part of the house where she was found. It is also clear from the evidence presented and from the photographs that Mrs. Epps was at times facing her attacker, that she was aware of what was happening at the hands of the Defendant. It is also clear that she made efforts to protect herself and get away from the blows being inflicted by the Defendant, and that she suffered great pain and mental anguish at the hands of the Defendant as he was attempting to inflict the blows with the *402 claw hammer that ultimately resulted in her death.
"Dr. Embry also testified unequivocally that Mrs. Epps would have been conscious when she received the defensive wounds and injuries as depicted in the photographic evidence.
"Roger Morrison, who specializes in serology with DNA analysis for the Alabama Department of Forensic Sciences, testified as to his involvement in investigating the crime scene. He testified that there were blood splatters from Mrs. Epps' wounds all around the area where she was found, that there was a good deal of blood on the floor, walls, furniture, and ceiling in the area where she was found. He also testified that he found a bloody palm print on a counter in the area where Mrs. Epps was found. Using DNA testing procedures, Mr. Morrison testified that the blood samples taken from the scene [were] from the victim, Mrs. Dorothy Epps.
"The bloody palm print was examined by Mr. Dan Lamont, a latent print examiner with the Huntsville Police Department, and he compared it to the known palm print of the Defendant, James Edward Barber. Mr. Lamont testified unequivocally that the palm print found on the countertop at the Epps residence was the palm print of the Defendant.
"The Defendant, James Edward Barber, was taken into custody on May 25th, 2001. Investigator Dwight Edger, prior to each discussion he had with the Defendant, read to him his Miranda rights and each time the Defendant acknowledged that he understood his rights and agreed to talk to Investigator Edger. The Defendant confessed to the commission of this crime, admitting that he struck Mrs. Epps with a claw hammer, grabbed her purse, and ran out of the house. Mrs. Epps' purse was never recovered nor was the claw hammer recovered."
(C.R. 271-72.)
The State also presented the following evidence:
Paul Desmet testified that George and Dorothy Epps owned a farm; that the Epps had an airstrip/runway and airplanes on the farm that they let other people use; and that, before the victim was killed, her husband had informed some of the people who used the runway that he was going to be out of town and had asked them to help by mowing the runway and checking on the victim. He also testified that he and his girlfriend went to the Epps' farm around 5:00 p.m. on Sunday, May 20, 2001, to do some mowing; that one of the other pilots was there and was already mowing; that he knocked on the back door and heard the television playing and dogs barking, but no one answered; that he looked in the back door to the right and yelled, but did not get a response; that he did not remember looking to the left; that he did not notice anything out of the ordinary; and that they stayed for fifteen to twenty minutes and left. Desmet further testified that he called the victim's house on Monday night, but he did not get an answer. Finally, at about 8:30 p.m. on Tuesday, May 22, 2001, he went back to the Epps' house; that he went to the back door and noticed that everything looked like it had on Sunday; that the television was playing, the dogs were barking, and the lights were on; that he looked in the door to the left and noticed that a stool had been knocked over and that there was an uncharacteristic mess on the floor; that he went in the door, yelled for the victim, looked to his left, and saw the victim on the floor; that he saw a large pool of blood on the floor; that he believed that the *403 victim was dead; and that he immediately contacted law enforcement authorities.
Michael James Beedard testified that he kept his airplane at a hangar on the Epps' farm; that he went to the farm between 3:30 p.m. and 4:00 p.m. on Sunday, May 20, 2001, to mow the grass and check on the victim; that he spoke to the victim briefly at that time; and that he left around 7:00 p.m. He also testified that, when he was leaving, he noticed Liz Epps' white Honda Accord station wagon under a carport at a guest house. However, he noted that he had not noticed that vehicle when he arrived that afternoon.
Investigator Brian Chaffin of the Madison County Sheriff's Department testified that he responded to a call at the victim's house at approximately 9:16 p.m. on May 22, 2001; that the victim's dead body was inside of the house to the left of the back door; that he saw a pool of blood and bloody footprints on the hardwood floor; that there were bloody footprints on the victim's back; that there was a bloody palm print on the countertop; that the bloody palm print had dried; that the bloody palm print was photographed and a portion of the countertop was collected; and that there were blood spatters against the counter and a refrigerator. He also testified that, at approximately 11:30 p.m. on May 24, 2001, he and other officers located the appellant and a female at a motel; took the appellant into custody; took the appellant to meet with Investigator Dwight Edger; and took the appellant's fingerprints and palm prints.
Esther Braswell testified that the appellant rented an apartment in the basement of her house in May 2001. She also testified that, on Sunday, May 20, 2001, she saw the appellant as she was on her way to go to church; that, when she returned around noon, the appellant's van was gone; that, around 3:00 p.m. or 4:00 p.m., the appellant called and asked her if she could cash a $50 check for him; that she said that she could not, but that she could loan him $30; that the appellant said that he wanted the money so he and Liz Epps could go to a movie; that, around 4:00 p.m., the appellant came to her back door, she gave him the $30, he gave her some spaghetti sauce, and he left; that, around 8:00 p.m., the appellant called, told her that he was on his way home in Liz's vehicle, told her that his keys were in his van, and asked her to open the back door for him; that she did; that, a few minutes later, she saw the appellant in Liz's vehicle; that the appellant said that he was going to take a shower and then go to a movie with Liz; that he left about 8:30 p.m.; that, about one hour later, she heard a vehicle and saw the appellant's van outside; and that the appellant stayed home the rest of the night. Finally, Braswell testified that she next saw the appellant around 11:00 a.m. or 11:30 a.m. on Wednesday, May 23, 2001; that the appellant knocked on her back door and asked if she had heard about the victim; that she said that she had not; that the appellant said that someone had beaten the victim to death; and that the appellant was really nervous.
Roger Morrison testified that there was not any blood evidence in the appellant's van. He also testified that a search of Liz's vehicle produced positive presumptive reactions for blood on the driver's seat near the center console, on the front passenger seat near the center console, on the right side of the backrest of the driver's seat, on the carpet near the accelerator, on the driver's side visor, on the driver's side of the center console, on the right shoulder area of the driver's seat, on the rear of the front passenger back seat, and on the steering wheel. However, he could not confirm that the stains were actually *404 bloodstains, could not confirm that the blood was human, and could not conduct any DNA testing on the areas because the samples were too small.
Investigator Dwight Edger of the Madison County Sheriff's Department testified that, at the time of the crime, Liz Epps was driving her father's vehicle; her vehicle was at the Epps' farm; and the keys to her vehicle were at a key station in the dining room of the Epps' house. He also testified regarding three interviews he conducted with the appellant, and videotapes of the interviews were played for the jury.
During the first interview, at 9:49 a.m. on May 23, 2001, the appellant was advised of his Miranda[1] rights, waived them, and agreed to talk to Edger; repeatedly asked what happened; stated that he was in shock that someone would hurt the victim; and contended that he did not know anything about the murder.
During the second interview, at approximately 1:11 a.m. on May 25, 2001, the appellant was again advised of his Miranda rights, waived them, and agreed to talk to Edger. When Edger advised him that they had narrowed the time of the victim's death to between Sunday at 4 p.m. and Monday at 10 p.m., the appellant gave an extremely detailed statement about where he had been and what he was doing during those times. Specifically, he contended that he was at home all day Sunday; that he made a pot of spaghetti, which he cooked all day; that he shared the spaghetti with his landlady; that he got up at about 6 a.m. on Monday; that he went to a certain paint store; that he and his brother Mark worked together until about 5 p.m.; that his sister-in-law cooked a nice dinner; that they watched television, including "Who Wants to be a Millionaire"; that he fell asleep on the couch by about 8 p.m.; that he got up about 6:50 a.m. on Tuesday, and his sister-in-law gave him a hard time because she had already been to the gym to work out; that he worked all day Tuesday; and that he spent Tuesday night with Mark. The appellant also stated that he had been doing work for the victim and that he was not quite finished. Upon questioning, he admitted that the victim owed him some money; that they had had a disagreement about whether she would pay him for the part he had already done or pay him all at once when he finished the work; and that the victim had originally wanted to pay him all at once when he finished the work, but they had agreed that she would pay for the part he had done and pay the remainder when he finished his work. The appellant also admitted that he still used cocaine; that he had used about $500 worth of cocaine during the last three weeks; and that his drug dealer had his van, allegedly because he was too intoxicated to drive. Finally, the appellant consented to a search of his residence and his vehicle, and he stated that he did not want to be a suspect.
During the third interview, at approximately 11:15 a.m. on May 25, 2001, the appellant was again advised of his Miranda rights, waived those rights, and agreed to talk to Edger. Initially, he adamantly denied that he killed the victim, even after being advised that officers had recovered his bloody palm print from the crime scene. Thereafter, however, he became very emotional and stated that, on the day of the murder, he had been using cocaine all day; that he thought about going to a movie with the victim's daughter Liz, but that Liz was in a meeting until late; that he was really "f___ed up" and did not plan to kill the victim; that he *405 went to the victim's house in his van; that he was talking to the victim; that he suddenly turned around and hit the victim with his hands and then with a hammer; that he threw the hammer in the trash and took the trash bag; that he took the victim's purse because it looked good and not to rob her; and that he threw the bag, purse, and his shoes in a dumpster at a carwash. The appellant estimated that he killed the victim around 7:00 p.m. on Saturday, May 19, 2001. He also made statements to the effect that he just wanted to die; that he did not want a trial; that he wanted to be executed; that he did not want to put the family through it; that he was so sorry and felt so bad for the victim's family; that the crime was senseless and stupid; that he did not want to face the victim's family; that he did not want attorneys; and that he wanted to be charged and put to death. In addition, he asked if he was going to get the death penalty, and he noted that it would be devastating to his and the victim's family. The appellant sobbed and cried throughout the interview and even after the interview was over, repeatedly showing remorse for his actions, and stated that he loved the victim and did not know why he had killed her. Finally, he agreed to write a statement at a later time and confirmed that he still consented to a search of his van and his residence.
Edger also testified that, sometime after May 25, 2001, the appellant asked to speak to him; that the appellant tried to give him a location of where he had been to show that he had not committed the murder; that he told the appellant that he had confessed; and that the appellant tried to say that he had not confessed and tried to act like the third interview had not taken place.
Finally, Dr. Embry testified that, based on his examination of the victim's body, the victim probably died on Sunday or Monday.
The defense presented the following evidence:
Jerry Barclay, a defense attorney who practiced in Madison County, testified regarding a case in which there were discrepancies in DNA test results in a case in which Roger Morrison was involved.
Scott Millhouse testified that he went to the Epps' farm at approximately 4:30 p.m. or 5:00 p.m. on Tuesday, May 22, 2001; that he mowed some grass; that, when he left around 7:15 p.m., he stopped by the back of the house and knocked, but did not get an answer; and that he looked through the back door briefly, but did not see anything.
Mark Barber testified that he is the appellant's brother and that they helped each other out with work. He also testified that he spoke to the appellant on the telephone around 1:00 p.m. on Sunday, May 20, 2001; that the appellant sounded like he was asleep; and that the appellant said he was watching television and cooking spaghetti sauce and was going to stay home that day. Barber further testified that he worked with the appellant on Monday, Tuesday, and Wednesday, May 21-23, 2001. He also indicated that the appellant spent the night at his house on Monday and Tuesday nights.
Finally, Elizabeth ("Liz") Epps testified that she had a relationship with the appellant before May 2001; that they had lived together in 2000, but had broken up because the appellant was using painkillers and cocaine; that the appellant returned to his home in Connecticut; that she later asked the appellant to return to Alabama; and that the appellant was not using drugs or drinking at that time. She also testified that, during the time the victim was killed, she was living in another area and was *406 driving her father's vehicle; her vehicle was parked at the Epps' farm; and the keys to her vehicle were in the house. Finally, she examined telephone records from the victim's house and explained that what appeared to be outgoing calls from the residence after the victim was killed were actually instances in which incoming calls were being bounced to an answering service.
The appellant raises several arguments on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review . . . whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).

I.
The appellant's first argument is that the trial court improperly admitted Dan Lamont's testimony that the bloody partial palm print that was found at the scene of the crime belonged to him.
Lamont testified that he had been employed as a latent print examiner by the Huntsville Police Department for twenty-one years; that, before that, he worked with the FBI in fingerprinting for ten years; that he had had extensive training in examining, comparing, and identifying fingerprints; that he trained new fingerprint technicians; that he had taught several classes concerning various aspects of fingerprint processing and identification; that he had made "[h]undreds of thousands" of comparisons and roughly one thousand identifications during his career; and that he had previously testified thirty or forty times as an expert witness regarding fingerprint evidence. (R. 745.) Lamont's training included ten or eleven week-long educational seminars sponsored by the International Association for Identification ("IAI"), another seminar sponsored by the Mississippi division of the IAI, the FBI's fingerprint technician class, the FBI's week-long advance fingerprint technology class, and the IAI's week-long advance ridgology class. He also testified to keeping current through professional journals and web sites.
Lamont testified that the print identification process includes four recommended steps: analysis, comparison, evaluation, and verification ("ACE-V"). Regarding the analysis step, Lamont testified that he looks at the latent print to determine whether there is sufficient friction ridge detail to make a comparison; that the skin on the palms of hands and bottoms of feet is called friction ridge skin; that the raised areas on that skin contain raised areas called ridges; and that the ridges can have varying characteristics. During the comparison step, he studies the various characteristics of the ridges and compares them to other ridges; that he picks two or three ridge details that are next to each other and that stand out to himi.e., that he knows he would see immediately if he looked at another print; that he looks for the same ridges and characteristics on another print; and that he repeats that process *407 several times between the unknown and the known prints. When performing the evaluation step, he makes comparisons back and forth between the unknown and the known prints until he is satisfied either that they are identical or that they are not identical based on the details and characteristics that match. Finally, regarding the verification step, Lamont testified that he had tried to get the Huntsville Police Department to institute a verification process, which involves an identification by another examiner, but had been successful only after he had examined the prints in this case.
Lamont testified that the ACE-V process is the accepted standard within the forensic identification community and that he had used the same analysis process for over thirty years. He also testified that, even though he had not had his conclusion verified, a verification by another examiner would not have affected his examination and conclusion; that a verification by another examiner would not have changed his conclusion; that he is very cautious when he makes identifications; and that another examiner would have reached the same conclusion he reached.
Regarding this case, Lamont testified that he examined a patent bloody partial palm print on the countertop and a known palm print from the appellant. Using the analysis, comparison, and evaluation steps described above, he concluded that the bloody print on the countertop matched the appellant's right palm print.
The defense extensively cross-examined Lamont about the accuracy of his methods; the fact that part of the identification process is subjective; the fact that he could have made a more in-depth examination of the prints; the possibility of distortions of both known and unknown prints; the fact that his results were not verified; the fact that he had not photographed or otherwise preserved the prints for later use; and the fact that he had previously made, but had not previously testified about, palm print identifications. The defense also cross-examined Chaffin about the fact that the bloody palm print was not a complete palm print and about giving Lamont the bloody palm print and the appellant's prints at the same time.

A.
At various times at trial and on appeal, the appellant has argued that the admissibility of Lamont's testimony was governed by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Frye v. United States, 293 F. 1013 (D.C.Cir.1923). On appeal, he also argues that, even if Rule 702, Ala. R. Evid., applies, Lamont's testimony still was not admissible.
In Alabama, by statute, the Daubert standard applies only to the admissibility of DNA evidence. See § 36-18-30, Ala.Code 1975; Bagley v. Mazda Motor Corp., 864 So.2d 301 (Ala.2003); Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 516 n. 5 (Ala.2000); Turner v. State, 746 So.2d 355 (Ala.1998); Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004).
"With respect to expert scientific testimony on subjects other than DNA techniques governed by § 36-18-30, Frye remains the standard of admissibility in Alabama. See Hoosier v. State, 612 So.2d 1352 (Ala.Crim.App.1992); Rivers v. Black, 259 Ala. 528, 68 So.2d 2 (1953)."
Turner, 746 So.2d at 361 n. 7. See also Minor, supra; Parker v. State, 777 So.2d 937 (Ala.Crim.App.2000). Finally, Rule 702, Ala. R. Evid., governs the admissibility of nonscientific expert testimony. See Minor, supra; Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.1999).
*408 In Simmons, 797 So.2d at 1152-54, we noted:
"In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court in a well-reasoned opinion held that Daubert factors may apply to the testimony of experts who are not scientists, but who have specialized knowledge. In Kumho, the United States Supreme Court stated:
"`In Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)], this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." 509 U.S., at 589, 113 S.Ct. 2786, 125 L.Ed.2d 469. The initial question before us is whether this basic gatekeeping obligation applies only to "scientific" testimony or to all expert testimony. We, like the parties, believe that it applies to all expert testimony. . . .
"`For one thing, Rule 702 itself says:
"`"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
"`This language makes no relevant distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. It makes clear that any such knowledge might become the subject of expert testimony. In Daubert, the Court specified that it is the Rule's word "knowledge," not the words (like "scientific") that modify that word, that "establishes a standard of evidentiary reliability." 509 U.S., at 589-590, 113 S.Ct. 2786, 125 L.Ed.2d 469. Hence, as a matter of language, the Rule applies its reliability standard to all "scientific," "technical," or "other specialized" matters within its scope. We concede that the Court in Daubert referred only to "scientific" knowledge. But as the Court there said, it referred to "scientific" testimony "because that [wa]s the nature of the expertise" at issue. Id., at 590, n. 8, 113 S.Ct. 2786.
"`Neither is the evidentiary rationale that underlay the Court's basic Daubert "gatekeeping" determination limited to "scientific" knowledge. Daubert pointed out that Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." Id., at 592, 113 S.Ct. 2786 (pointing out that experts may testify to opinions, including those that are not based on firsthand knowledge or observation). The Rules grant that latitude to all experts, not just to "scientific" ones.
"`Finally, it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. There is no clear line that divides the one from the others. Disciplines such as engineering rest upon scientific knowledge. Pure scientific theory itself may depend for its development upon observation and properly engineered machinery. And conceptual efforts to *409 distinguish the two are unlikely to produce clear legal lines capable of application in particular cases. . . .
"`Neither is there a convincing need to make such distinctions. Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L.Rev. 40, 54 (1901). And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own." Ibid. The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.
"`We conclude that Daubert's general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U.S., at 590, 113 S.Ct. 2786. It "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." Id., at 592, 113 S.Ct. 2786. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . ., the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S., at 592, 113 S.Ct. 2786.
"`. . . .
"`The petitioners ask more specifically whether a trial judge determining the "admissibility of an [specialized knowledge] expert's testimony" may consider several more specific factors that Daubert said might "bear on" a judge's gatekeeping determination. These factors include:
"`Whether a "theory or technique . . . can be (and has been) tested";
"`Whether it "has been subjected to peer review and publication";
"`Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
"`Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." 509 U.S., at 592-594, 113 S.Ct. 2786.
"`Emphasizing the word "may" in the question, we answer that question yes.
"` . . . Daubert makes clear that the factors it mentions do not constitute a "definitive checklist or test." Id., at 593, 113 S.Ct. 2786. And Daubert adds that the gatekeeping inquiry must be "`tied to the facts'" of a particular "case." Id., at 591, 113 S.Ct. 2786 (quoting United States v. Downing, 753 F.2d 1224, 1242 (C.A.3 1985)). We agree . . . that "[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." . . . Too much depends upon the particular circumstances of the particular case at issue.

*410 "`. . . .
"` . . . The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Nor do we deny that, as stated in Daubert, the particular questions that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony.'
"526 U.S. at 148-51, 119 S.Ct. at 1174-76."
(Footnote omitted.)
To date, the Alabama Supreme Court has declined to reject Frye and to extend the Daubert standard to the admission of all expert testimony. See General Motors Corp. v. Jernigan, 883 So.2d 646, 661 (Ala. 2003) ("GM argues that we should change the law in Alabama to embrace the standard for admitting expert testimony set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), instead of retaining the standard set forth in Frye v. United States, 293 F. 1013 (D.C.Cir.1923), which we have followed for many years. See Courtaulds Fibers, Inc. v. Long, 779 So.2d 198 (2000), and Southern Energy Homes, Inc. v. Washington, 774 So.2d 505 (2000). We decline to change the standard in this case."); Bagley, 864 So.2d at 310 ("The Bagleys assert that the appellate courts of this state `have never recognized that Daubert is controlling in any case . . . other than those involving the admission of DNA evidence.' This is an accurate statement of the status of the Daubert standard in our state courts as of the time of this appeal.").
The appellant appears to argue that this court followed Kumho and applied Daubert to nonscientific evidence in Simmons and that we should do the same in this case. In Simmons, we stated, in part:
"Simmons contends that the trial court erred in admitting into evidence the testimony of Thomas Neer, an agent for the Federal Bureau of Investigation, who worked in their profiling behavioral assessment unit. Neer testified that he had specialized knowledge in crime scene analysis and victimology. According to Neer, his analysis of the crime scene and other evidence of the offense indicated that the offense was sexually motivated and that the person who committed the offense did so for sexual gratification. Simmons argues that the trial court erred in admitting Neer's testimony into evidence because, he says, the evidence was based on scientific analysis and did not meet the Frye standard.
". . . .
"Simmons's argument is based on a principle articulated in Frye v. United States, 293 F. 1013 (D.C.Cir.1923), which held:
"`Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in the twilight zone the evidential force of principle must be recognized, and while the courts will go a long way in admitting expert testimony deduced *411 from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.'
"293 F. at 1014. The Alabama Supreme Court in Ex parte Perry, 586 So.2d 242 (Ala.1991), adopted the Frye test as the standard by which the trial court is to determine whether novel scientific evidence is admissible. Perry, 586 So.2d at 247. See also Turner v. State, 746 So.2d 355 (Ala.1998).
"We reject Simmons's argument that Neer's testimony was based on novel scientific evidence. Crime-scene analysis and victimology do not rest on scientific principles like those contemplated in Frye; these fields constitute specialized knowledge. Specialized knowledge offers subjective observations and comparisons based on the expert's training, skill, or experience that may be helpful to the jury in understanding or determining the facts. Crime-scene analysis, which involves the gathering and analysis of physical evidence, is generally recognized as a body of specialized knowledge. See generally 2 Wigmore, Evidence § 417b at 499 (1979); State v. Russell, 125 Wash.2d 24, 882 P.2d 747 (1994), cert. denied, 514 U.S. 1129, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995); United States v. Meeks, 35 M.J. 64 (C.M.A.1992); People v. Nolan, 152 Ill. App.3d 260, 105 Ill.Dec. 336, 504 N.E.2d 205 (1987); and Hill v. State, 647 S.W.2d 306 (Tex.App.1982). Therefore, because crime-scene analysis is not scientific evidence, we conclude that we are not bound by the test enunciated in Frye. Cf. Ex parte Dolvin, 391 So.2d 677 (Ala.1980) (holding that Frye was inapplicable when evidence is in the nature of physical comparisons as opposed to scientific tests or experiments).
"The proper standard to determine whether Neer's testimony is admissible is Rule 702, Ala. R. Evid., which provides:
"`If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.'
"`"[A]ny objection to an expert witness on the ground that he or she lacks knowledge goes to the weight rather than to the admissibility of his or her testimony."' Holland v. State, 666 So.2d 547, 548 (Ala.Cr.App.1995), quoting Smoot v. State, 520 So.2d 182, 189 (Ala.Cr.App.1987). Whether a witness will be allowed to testify as an expert is largely discretionary and the trial court's decision will not be disturbed `except for palpable abuse.' Holland v. State, 666 So.2d at 549, quoting Sharp v. Argo-Collier Truck Lines Corp., 356 So.2d 147 (Ala.1978).
". . . .
"Alabama Rule of Evidence 702 is identical to the Federal Rule of Evidence 702. Fairness to a party seems to dictate that before evidence based on specialized knowledge can be admitted against a party at trial, the party is entitled to a determination that the specialized knowledge is reliable and that it is relevant to a material issue. Once the trial court determines that the testimony involves a legitimate specialized knowledge, that the witness is an expert in that field, and that the expert testimony would assist the jury, a party's rights are adequately protected by the ability to subject witnesses to cross-examination *412 and to attack the basis and methods used in developing the opinion.
"Therefore, with the principles enunciated in Daubert and Kumho in mind, we must determine whether the fields of victimology and crime-scene analysis constitute reliable specialized knowledge; whether Neer is an expert within these fields; and whether the subject matter of his testimony is relevant and assists the trier of fact in this case.
"Our review of the record indicates that the trial court carefully evaluated the admissibility of Agent Neer's testimony by conducting a lengthy voir dire. Neer testified that he had been investigating homicide crime scenes for approximately 20 years and that he had extensive experience. According to Neer:
"`We [Neer and his peers] review cases that are submitted by state, local, and federal law enforcement agencies, unsolved cases that can be homicides, arson, sexual assault, stalking, matters of work place violence, kidnapping, extortions, product tampering. . . . Essentially, we review a myriad of criminal cases and provide the requesting law enforcement agencies with different types of assistance. It could be investigative strategy or suggestions; it could be an unknown profile characteristics; it could be behavioral assessment, threat assessment.
"`. . . .
"`Criminal investigative analysis is a process whereby we look at a variety of aspects of investigation. And, . . . these are usually cases that are afforded our unit because they are unresolved or unsolved. The criminal investigative process involves looking at a case from the standpoint of what we call victimology, which is look[ing] at the victim, trying to understand many aspects of why this person was a victim, why in this location. We look at the scene itself and draw inferences from the crime scene. We rely on the report of the medical examiner and on photographs of the scene, on any toxicology findings. We usually look at the demographics of the area; we look at maps. So, we consider many different sources before we come up with an assessment.'
"(R. 41-44.)
"During defense counsel's cross-examination of Neer, Neer testified that crime-scene analysis of homicides that appear to be sexually motivated began developing as a specialized field in the late 1970s and that the research has been published within the field and subjected to peer review. Neer established the general acceptance of victimology when he testified that numerous law enforcement agencies relied upon crime-scene analysis and victimology when conducting their investigations. Neer detailed the theories supporting crime scene-analysis and victimology, the way the theories are applied by others with the same `specialized knowledge,' and the way the specialized knowledge was applied in this particular case. He further explained the method in which he conducted his investigation and the factors considered in reaching his determination. We recognize that through interviews, case studies, and research a person may acquire superior knowledge concerning characteristics of an offense. Thus, based on the record before us, adequate evidence was presented to establish the reliability of crime-scene analysis and victimology as fields of specialized knowledge. Cf. United States v. Alzanki, 54 F.3d 994 (1st. Cir.1995), cert. denied, 516 U.S. 1111, 116 S.Ct. 909, 133 L.Ed.2d 841 (1996)(holding that *413 testimony of victimologist was relevant in trial for holding household employee in involuntary servitude).
"Our review of the record further indicates that the trial court carefully evaluated Agent Neer's professional qualifications. Neer testified that his principal training and experience related to criminal investigative analysis, including `victimology' and that he had taught training sessions in this field. He further testified that he had investigated hundreds of crimes, including sexually motivated homicides. He stated that he had participated in a research project concerning the rape and murder of the elderly and that the foundation for his opinion in this case rested upon his experiences and understanding of offenders and crime scenes. Therefore, Neer was qualified to testify as an expert in the area of crime-scene analysis and victimology, especially concerning the behavior of offenders who sexually exploit their victims. See Edward J. Imwinkelried, The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony, 15 Cardoza L.Rev. 2271, 2292-93 (stating that the reliability of nonscientific expert testimony increases the more experiences an expert has had and the similarity of those experiences to the expert's testimony). Cf. Perkins v. State, [808] So.2d [1041] (Ala.Cr.App.1999)(expert's testimony in trial that the victim's broken bone was consistent with a struggle was properly admitted); Hampton v. State, 621 So.2d 376, 377 (Ala.Cr.App.1993)(expert's testimony in trial of defendant accused of first-degree rape that victim's wounds were `consistent with "forcible compulsion"' was properly admitted); and Moss v. State, 545 So.2d 230, 231 (Ala.Cr.App.1989)(expert's testimony in trial of defendant accused of first-degree rape that victim `had recent intercourse that had been somewhat forceful' was properly admitted).
"Moreover, we note that experienced officers are qualified to give their opinion regarding their field of expertise. See, e.g., Reuther v. City of Leeds, 599 So.2d 1246, 1248 (Ala.Cr.App.1992) (officer with experience regarding persons driving under the influence was qualified to testify concerning whether the defendant was intoxicated when he was stopped); Donahoo v. State, 552 So.2d 887, 897 (Ala.Cr.App.1989)(Alabama Bureau of Investigation agent experienced in the field of narcotics was qualified to testify concerning the age of marijuana plants); Sanders v. City of Birmingham, 542 So.2d 325, 330 (Ala.Cr.App.1988)(police officers were qualified to testify as to whether defendant was intoxicated); Jackson v. State, 440 So.2d 1181, 1184 (Ala. Cr.App.1983)(police officers were competent to testify concerning whether defendant was intoxicated or under the influence of drugs).
"Thus, we conclude that Neer's testimony adequately established that crime-scene analysis and victimology are reliable fields of specialized knowledge and that, based upon his studies and experiences in these fields, he was an expert.
"Additionally, we must determine the relevance of the evidence and its ability to assist the jury.
"`Trial courts should make the "relevance" assessment by addressing the "fit" between what the scientific theory and technique are supposed to show and what must be shown to resolve the factual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the *414 weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible.'
"Turner, 746 So.2d at 361.
"In this case Simmons was charged with murder made capital because the murder was committed during first-degree sexual abuse. The state was required to prove that Simmons subjected M.A. to sexual contact by forcible compulsion. § 13A-6-66, Ala.Code 1975. First-degree sexual abuse requires proof that the defendant acted with the intent to gratify his sexual desires or those of the person contacted. Intent to gratify the desire of either party may be inferred by the jury from the act itself. Houston v. State, 565 So.2d 1263 (Ala. Cr.App.1990); see Ex parte Cofer, 440 So.2d 1121 (Ala.1983). Forcible compulsion is defined as `physical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person.' § 13A-6-60(8), Ala.Code 1975.
"The jury in this case was presented with a homicide trial at which no eyewitnesses testified. M.A.'s body was discovered in a horrifyingly mutilated condition. The method and motivation for killing an elderly female presented serious questions for the jury to resolve. Whether the offender received sexual gratification while committing the offense was a critical issue of the case, and Neer's testimony was probative on that issue. Inferences had to be drawn from the physical evidence presented at the crime scene. Neer offered observations of the crime scene and the elderly female victim that would assist the jury in evaluating the circumstances surrounding the murder and the reasons for the method employed by the offender. `A homicide and its crime scene, after all, are not matters likely to be within the knowledge of an average [trier of fact].' United States v. deSoto, 885 F.2d 354, 359 (7th Cir.1989).
"We conclude that, in light of the grotesqueness of the crime scene and the condition of M.A.'s body, the trial court did not err in admitting Neer's testimony because the jury would be greatly assisted by a professional analysis of the crime scene in comparison to other murder cases. It seems to us that expert testimony on this subjectwhich the defense was free to contradictwas reasonably likely to assist the jury in understanding and in assessing the evidence, in that the matter at issue was highly material, and beyond the realm of `acquired' knowledge normally possessed by lay jurors. As the trial court concluded, `[I]n my judgment he presents a specialized knowledge that the rule talks about that would assist the jury in assessing whether or not the offenderwhoever the offender . . .  derived sexual gratification from his actions.' (R. 78.) Cf. United States v. Cross, 928 F.2d 1030 (11th Cir.1991), cert. denied, 502 U.S. 985, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991)(holding . . . expert witness could testify that pictures would be of sexual interest to pedophiles especially when `"contested materials are directed at . . . [such] a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest."'); United States v. Johnson, 735 F.2d 1200, 1202 (9th Cir.1984)(holding that `government *415 agents or similar persons may testify as to the general practices of criminals to establish the defendants' modus operandi'); and United States v. Maher, 645 F.2d 780, 783 (9th Cir.1981)(permitting expert testimony that defendant's actions were consistent with the modus operandi of persons transporting drugs and engaging in countersurveillance)."
797 So.2d at 1150-57.
In Simmons, we specifically stated that the admissibility of the expert's testimony was governed by Rule 702, Ala. R. Evid. Thereafter, in determining whether the trial court properly admitted the expert's testimony, we made reference to the decisions in Kumho and Daubert. However, we did not specifically hold that Daubert governs the admissibility of nonscientific expert testimony. Therefore, although we used some of the language in Kumho and Daubert when determining the admissibility of the expert's testimony pursuant to Rule 702, Ala. R. Evid., in Simmons, we do not read Simmons to require that the admission of nonscientific expert testimony be governed by Daubert.
Before we decide which standard the trial court should have used to determine the admissibility of Lamont's testimony, we must determine whether print identification constitutes scientific or nonscientific expert testimony. In Minor, 914 So.2d at 399-401, we made a similar determination as follows:
"Minor also argues that Dr. Hardin's testimony was not proper rebuttal because, he says, it was not competent evidence. According to Minor, `Dr. Hardin's testimony could not be considered competent evidence because it did not meet the requirements for expert scientific testimony set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).' (Minor's brief at p. 21.) Minor maintains that `Dr. Hardin's theory of rapidly dropping hematocrit' has never been subject to peer review or publication and is not generally accepted in the scientific community and thus was not admissible scientific evidence. (Minor's brief at p. 14.)
"Initially, we point out that Minor's reliance on Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), is misplaced because the Daubert standard for admissibility of scientific evidence applies by statute in Alabama only to DNA evidence. See § 36-18-30, Ala.Code 1975; Bagley v. Mazda Motor Corp., 864 So.2d 301, 310 (Ala.2003); Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 516 n. 5 (Ala. 2000); and Turner v. State, 746 So.2d 355 (Ala.1998). In Alabama, the standard for determining the admissibility of scientific evidence other than DNA evidence is that set forth in Frye v. United States, 293 F. 1013 (D.C.Cir.1923). See Turner, 746 So.2d at 361 n. 7 (`With respect to expert scientific testimony on subjects other than DNA techniques governed by § 36-18-30, Frye remains the standard of admissibility in Alabama.').
"That being said, the crux of Minor's argument is that Dr. Hardin's testimony did not satisfy the requirements for the admissibility of scientific evidence. However, as the State correctly points out in its brief to this Court, it was not necessary that Dr. Hardin's testimony satisfy those requirements because his testimony did not constitute novel scientific evidence. In this respect, we point out that Minor does not challenge the evidence of Ebious's hematocrit level or the testing procedure used by the laboratory personnel at DCH to obtain Ebious's hematocrit level. Rather, Minor's sole argument is that Dr. Hardin's testimony that, based on his training and *416 experience, it was his opinion that Ebious's hematocrit level could have dropped to 11.4% within an hour of his receiving his injuries, was inadmissible. The Frye test, however, applies only to the admissibility of novel scientific evidence based on scientific tests or experiments. Dr. Hardin's testimony was no more novel scientific evidence than was the testimony of the defense's two experts on the same subject. Although Dr. Hardin's testimony was based on scientific evidence, i.e., the results of a blood test, it was not itself scientific evidence. Despite Minor's characterization of Dr. Hardin's testimony as a `theory of rapidly dropping hematocrit,' Dr. Hardin's testimony was not a scientific theory, but was merely his opinion based on his experience and training as a pediatric trauma surgeon and, therefore, his testimony was not subject to the requirements of Frye. See, e.g., Courtaulds Fibers, Inc. v. Long, 779 So.2d 198 (Ala.2000) (holding that veterinarian's opinion as to cause of death of horses was not scientific evidence subject to admissibility requirements of Frye); Ex parte Dolvin, 391 So.2d 677 (Ala.1980) (holding that Frye test was inapplicable to testimony of forensic odontologist comparing skeletal remains with inter vivos photographs because testimony was in the nature of physical comparisons as opposed to scientific tests or experiments); Simmons v. State, 797 So.2d 1134 (Ala.Crim.App. 1999) (holding that Frye test was inapplicable to expert testimony in crime-scene analysis and victimology because testimony was not based on scientific principles but was in the realm of specialized knowledge); West v. State, 793 So.2d 870 (Ala.Crim.App.2000) (holding that Frye test was inapplicable to testimony of handwriting expert because testimony was not based on scientific tests or experiments); and Stewart v. State, 601 So.2d 491, 499 (Ala.Crim.App.), on return to remand, 659 So.2d 120 (Ala. Crim.App.1992), aff'd in pertinent part, rev'd in part on other grounds, 659 So.2d 122 (Ala.1993) (holding that Frye test was inapplicable to testimony regarding results of lumi-lite test because the test did not involve `comparing scientific data or experiments such as deoxyribonucleic acid (DNA) testing or voice print analysis').
"Instead, the admissibility of Dr. Hardin's testimony was governed by Rule 702, Ala. R. Evid., which provides:
"`If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.'
"Dr. Hardin's opinion that in extreme circumstances an infant's hematocrit level could drop to 11.4% within an hour of receiving trauma and his opinion, based on the prosecutor's hypothetical question, that Ebious's hematocrit level could have so dropped based on the severity of his injuries was proper under Rule 702. Although Minor did not challenge Dr. Hardin's qualifications at trial or on appeal, we note that Dr. Hardin was clearly qualified as a medical expert; he testified that he was board-certified in general and pediatric surgery, that he was an associate professor of surgery in pediatrics at UAB, and that he had been director of the trauma service at Children's Hospital for 10 years. His opinion was based on his training and experience as a pediatric trauma surgeon and was helpful to the jury in understanding the significance of Ebious's hematocrit *417 level, an issue injected into the trial by Minor himself.
"Therefore, we find no error, plain or otherwise, in the trial court's allowing Dr. Hardin to testify in rebuttal."
(Footnote omitted.) See also Simmons, supra (holding that crime-scene analysis and victimology constitute specialized knowledge rather than scientific evidence).
Because this case does not involve DNA evidence, the Daubert standard does not apply. Also, because print identification involves subjective observations and comparisons based on the expert's training, skill, or experience, we conclude that it does not constitute scientific evidence and that, therefore, Frye does not apply. Rather, print identification constitutes specialized knowledge that may be helpful to the jury in understanding or determining the facts. Therefore, Rule 702, Ala. R. Evid., governs the admissibility of Lamont's testimony.
"Rule 104, Ala. R. Evid., states, in pertinent part:
"`(a) Questions of Admissibility Generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.'
"The Advisory Committee's Notes to Rule 104(a) state:
"`Like preexisting Alabama law, and like the corresponding federal rule, this section recognizes that preliminary questions intended to establish conditions precedent to admissibility are for the court rather than the jury. C. Gamble, McElroy's Alabama Evidence § 464.01 (4th ed. 1991); Fed. R.Evid. 104. . . . This principle is . . . applied when a trial court determines whether a witness's qualifications authorize the witness to testify as an expert. See Ala. R. Evid. 702.'
". . . .
". . . .
"The Advisory Committee's Notes to Rule 702 explain that `[a]s under preexisting Alabama law, both questions whether a witness is qualified as an expert and whether, if so qualified, that witness may give expert opinion or testimony on the subject in questionare left largely to the discretion of the trial judge. Hagler v. Gilliland, 292 Ala. 262, 292 So.2d 647 (1974).'"
Bagley, 864 So.2d at 311-13.
Because Lamont testified that the bloody partial palm print that officers found at the crime scene belonged to the appellant, his testimony would have assisted the jury in determining the appellant's guilt. Also, Lamont's training and experience clearly qualify him as an expert in the field of print identification. Therefore, Lamont's testimony satisfied the requirements of Rule 702, Ala. R. Evid.
Moreover, even if we were to apply the Daubert standard to Lamont's testimony, we would still find that the testimony was admissible. With specific reference to the Daubert factors and fingerprint identification, the appellant argues that the underlying premises upon which print identification is based have not been proven by testing; that there is not a known error rate for the technique; and that there is not an objective, threshold standard to guide examiners in making a positive identification. Other jurisdictions have addressed and rejected similar arguments as follows:

*418 "Fingerprint and handwriting analysis have long been recognized by the courts as sound methods for making reliable identifications. See, e.g., Piquett v. United States, 81 F.2d 75, 81 (7th Cir. 1936) (fingerprints); Robinson v. Mandell, 20 F. Cas. 1027 (D.Mass.1868) (handwriting). Today, however, Crisp challenges the district court's decisions to permit experts in those fields to testify on behalf of the prosecution. The fingerprinting expert, Brannan, gave her opinion that a palm print lifted from the Note was that of Crisp. . . .
"The Federal Rules of Evidence provide that `[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. . . .' Fed.R.Evid. 702. The Supreme Court has made clear that it is the trial court's duty to play a gatekeeping function in deciding whether to admit expert testimony: `[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.' Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
"In Daubert, the Court announced five factors that may be used in assessing the relevancy and reliability of expert testimony: (1) whether the particular scientific theory `can be (and has been) tested'; (2) whether the theory `has been subjected to peer review and publication'; (3) the `known or potential rate of error'; (4) the `existence and maintenance of standards controlling the technique's operation'; and (5) whether the technique has achieved `general acceptance' in the relevant scientific or expert community. Id. at 593-94, 113 S.Ct. 2786. Rather than providing a definitive or exhaustive list, Daubert merely illustrates the types of factors that will `bear on the inquiry.' Id. As Daubert emphasized, the analysis must be `a flexible one.' Id.; see also Kumho, 526 U.S. at 141-42, 119 S.Ct. 1167 (concluding that testing of reliability should be flexible and that Daubert's five factors neither necessarily nor exclusively apply to every expert).
"A.
"We turn first to whether the fingerprint evidence was properly admitted against Crisp. Crisp has challenged the admission of this evidence on several grounds: His primary contention is that the premises underlying fingerprinting evidence have not been adequately tested. Crisp also maintains that there is no known rate of error for latent fingerprint identifications, that fingerprint examiners operate without a uniform threshold of certainty required for a positive identification, and that fingerprint evidence has not achieved general acceptance in the relevant scientific community.
"1.
"Fingerprint identification has been admissible as reliable evidence in criminal trials in this country since at least 1911. See People v. Jennings, 252 Ill. 534, 96 N.E. 1077 (1911); see also Jennifer L. Mnookin, Finger-print Evidence in an Age of DNA Profiling, 67 Brooklyn L.Rev. 13 (2001) (discussing history of fingerprint identification evidence). While we have not definitively assessed the admissibility of expert fingerprint identifications in the post-Daubert era, every Circuit that has done so has found such evidence admissible. See United *419 States v. Hernandez, 299 F.3d 984 (8th Cir.2002) (concluding that fingerprint identification satisfies Daubert); United States v. Havvard, 260 F.3d 597, 601 (7th Cir.2001) (same); United States v. Sherwood, 98 F.3d 402, 408 (9th Cir. 1996) (noting defendant's acknowledgment that `fingerprint comparison has been subjected to peer review and publication,' and holding that trial court did not commit clear error where it admitted fingerprint evidence without performing Daubert analysis); see also United States v. Llera Plaza, 188 F.Supp.2d 549, 572-73 (E.D.Pa.2002) (discussing long history of latent fingerprint evidence in criminal proceedings, and citing lack of proof of its unreliability, to hold such evidence admissible); United States v. Joseph, 2001 WL 515213, *1 (E.D.La. May 14, 2001) (observing that `fingerprint analysis has been tested and proven to be a reliable science over decades of use for judicial purposes'); United States v. Martinez-Cintron, 136 F.Supp.2d 17, 20 (D.P.R. 2001) (noting that questions of reliability of fingerprint identifications can be addressed through vigorous cross-examination of expert witness).
"Upholding a district court's admission of fingerprint evidence, the Seventh Circuit emphasized in Havvard that the district court `properly considered the Daubert factors in analyzing [the defendant's] motion and concluded that fingerprinting techniques have been tested in the adversarial system, that individual results are routinely subjected to peer review for verification, and that the probability of error is exceptionally low.' 260 F.3d at 601. As here, the defendant in Havvard contended that `fingerprint comparisons are not reliable because the government admits that the basic premise that all fingerprints are unique remains unproven, and because there are no objective standards for defining how much of a latent fingerprint is necessary to conduct a comparison or for evaluating an individual examiner's comparison.' Id. at 600. The defendant further maintained that the district court erred in requiring him to offer some basis on which to find fingerprint analysis unreliable. Id. The Havvard court, however, properly rejected this line of argument. Emphasizing that general acceptance remains an important consideration under Daubert, the Seventh Circuit concluded that the district court properly recognized that `establishing the reliability of fingerprint analysis was made easier by its 100 years of successful use in criminal trials, and appropriately noted that nothing presented at the hearing undermined [the expert's] testimony.' Id. at 600-01.
"2.
"In his challenge to the admissibility of the fingerprint evidence, Crisp begins with the contention that the basic premises underlying fingerprint identification have not been subjected to adequate testing. The two premises that he singles out as requiring more searching scrutiny are: (1) that no two persons share the same fingerprint; and (2) that fingerprint examiners are able to make reliable identifications on the basis of small, distorted latent fingerprint fragments. In support of his assertions, Crisp notes that the expert in this case, Brannan, was unable to reference any study establishing that no two persons share the same fingerprint; she was able only to testify that no study had ever proven this premise false. In addition, Crisp contends that the Government itself seems unsure of the reliability of fingerprint evidence: in particular, Crisp notes that the National Institute *420 of Justice, an arm of the Department of Justice, issued a solicitation for fingerprint validation studies in March of 2000. This solicitation calls for `basic research to determine the scientific validity of individuality in friction ridge examination,' and also seeks the development of standard procedures for fingerprint comparisons and for the testing of those procedures once adopted. National Institute of Justice, Forensic Friction Ridge (Fingerprint) Examination Validation Studies 4 (Mar. 2000). Finally, though Crisp cites no studies demonstrating the unreliability of fingerprinting analysis, he brings to our attention two law review articles discussing the paucity of research into the fingerprint identification process.
"Crisp next maintains that, because the basic premises behind fingerprint analysis have not been properly tested, there can be no established error rates. He also asserts that fingerprint examiners operate without uniform, objective standards, noting that Brannan herself testified that there is no generally accepted standard regarding the number of points of identification necessary to make a positive identification. Finally, Crisp contends that, while fingerprint analysis has gained general acceptance among fingerprint examiners themselves, this factor should be discounted because, according to Crisp, the relevant community `is devoid of financially disinterested parties such as academics.' United States v. Starzecpyzel, 880 F.Supp. 1027, 1038 (S.D.N.Y.1995).
"3.
"Crisp today advocates the wholesale exclusion of a long-accepted form of expert evidence. Such a drastic step is not required of us under Daubert, however, and we decline to take it. The Daubert decision, in adding four new factors to the traditional `general acceptance' standard for expert testimony, effectively opened the courts to a broader range of opinion evidence than was previously admissible. Although Daubert attempted to ensure that courts screen out `junk science,' it also enabled the courts to entertain new and less conventional forms of expertise. As the Court explained, the addition of the new factors would put an end to the `wholesale exclusion [of expert testimony based on scientific innovations] under an uncompromising "general acceptance" test.' Daubert, 509 U.S. at 596, 113 S.Ct. 2786.
"The touchstones for admissibility under Daubert are two: reliability and relevancy. See id. at 589, 597, 113 S.Ct. 2786; see also Kumho, 526 U.S. at 152, 119 S.Ct. 1167 (`The objective of [Daubert's gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.'). Under Daubert, a trial judge need not expend scarce judicial resources reexamining a familiar form of expertise every time opinion evidence is offered. In fact, if a given theory or technique is `so firmly established as to have attained the status of scientific law,' then it need not be examined at all, but instead may properly be subject to judicial notice. Daubert, 509 U.S. at 592 n. 11, 113 S.Ct. 2786.
"While the principles underlying fingerprint identification have not attained the status of scientific law, they nonetheless bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well. See Havvard, 260 F.3d at 601 (noting lower court's observation that fingerprint analysis has enjoyed `100 years of successful use in criminal trials'); Llera Plaza, 188 F.Supp.2d at 563, 572-76 (describing longstanding consensus in expert community as to reliability *421 of fingerprint identification process in holding admissible expert fingerprint identification evidence); see also Hernandez, 299 F.3d at 991 (upholding admissibility of fingerprint identification evidence one year ago); Jennings, 96 N.E. at 1083 (upholding admissibility of fingerprint identification evidence ninety-two years ago). Put simply, Crisp has provided us no reason today to believe that this general acceptance of the principles underlying fingerprint identification has, for decades, been misplaced. Accordingly, the district court was well within its discretion in accepting at face value the consensus of the expert and judicial communities that the fingerprint identification technique is reliable.
"In addition to a strong expert and judicial consensus regarding the reliability of fingerprint identification, there exist the requisite `standards controlling the technique's operation.' Daubert, 509 U.S. at 593, 113 S.Ct. 2786. As Brannan testified, while different agencies may require different degrees of correlation before permitting a positive identification, fingerprint analysts are held to a consistent `points and characteristics' approach to identification. Analysts are also consistently subjected to testing and proficiency requirements. Brannan's testimony is entirely in keeping with the conclusions of the post-Daubert courts that uniform standards have been established `through professional training, peer review, presentation of conflicting evidence and double checking.' Rogers, 2001 WL 1635494, *1; see also, e.g., Llera Plaza, 188 F.Supp.2d at 566-71 (detailing development of identification criteria and holding that `standards which control the opining of a competent fingerprint examiner are sufficiently widely agreed upon to satisfy Daubert requirements'); cf. Havvard, 260 F.3d at 599 (holding that, while uniform standards may not exist, `the unique nature of fingerprints is counterintuitive to the establishment of such a standard').
"Furthermore, in Havvard, the Seventh Circuit determined that Daubert's `known error rate' factor was satisfied because the expert had testified that the error rate for fingerprint comparison was `essentially zero.' 260 F.3d at 599. Similarly, and significantly, Brannan testified here to a negligible error rate in fingerprint identifications.
"In sum, the district court heard testimony to the effect that the expert community has consistently vouched for the reliability of the fingerprinting identification technique over the course of decades. That evidence is consistent with the findings of our sister circuits, and Crisp offers us no reason to believe that the court abused its discretion in crediting it. The district court also heard evidence from which it was entitled to find the existence of professional standards controlling the technique's operation. Those standards provide adequate assurance of consistency among fingerprint analyses. Finally, the court heard testimony that fingerprint identification has an exceedingly low rate of error, and the court was likewise within its discretion in crediting that evidence. While Crisp may be correct that further research, more searching scholarly review, and the development of even more consistent professional standards is desirable, he has offered us no reason to reject outright a form of evidence that has so ably withstood the test of time.
"Finally, even if we had a more concrete cause for concern as to the reliability of fingerprint identification, the Supreme Court emphasized in Daubert that `[v]igorous cross-examination, presentation of contrary evidence, and careful *422 instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' Daubert, 509 U.S. at 596, 113 S.Ct. 2786. Ultimately, we conclude that while further research into fingerprint analysis would be welcome, `to postpone present in-court utilization of this bedrock forensic identifier pending such research would be to make the best the enemy of the good.' Llera Plaza, 188 F.Supp.2d at 573 (internal quotation omitted)."
United States v. Crisp, 324 F.3d 261, 265-70 (4th Cir.2003) (footnotes omitted). See also United States v. Janis, 387 F.3d 682 (8th Cir.2004); United States v. Mitchell, 365 F.3d 215 (3d Cir.2004). See generally Hannon v. State, 84 P.3d 320 (Wyo.2004); Christian v. Gray, 65 P.3d 591 (Okla.2003); State v. Cole, (Del. June 19, 2002) (not published in A.2d); State v. Vliet, 95 Hawai'i 94, 19 P.3d 42 (2001); Goodyear Tire & Rubber Co. v. Thompson, 11 S.W.3d 575 (Ky.2000).
Based on Lamont's testimony, as set forth herein, and the decisions from other jurisdictions, as set forth above, we conclude that, even applying the Daubert standard, Lamont's testimony was admissible.
Finally, Lamont's testimony, although prejudicial, was highly probative because it placed the appellant at the crime scene either during the offense or shortly thereafter. Moreover, with regard to expert testimony, the trial court specifically instructed the jury as follows:
"The oath of office that you took last Tuesday or Wednesday commits you to determine the evidence in this case based only on what is presented from the witness stand. There have been witnesses that testified in this case as experts. And an expert witness is one who by education, training, and/or experience has obtained such skill, knowledge, or experience of some science, profession, business, or occupation that is not of common knowledge to the average lay person. And witnesses who have testified as experts have been allowed to express opinions based upon facts which might have been set forth in hypothetical questions or facts that were related to the witness or that the witness related to you. The weight to be accorded such testimony is dependent entirely upon the truth of the material facts stated in those questions and the testimony before you, and before considering the opinion of an expert, you should first examine carefully all the material facts stated in court and be reasonably satisfied that they have substantially been proven to be true."
(R. 1162.) In light of the importance of Lamont's testimony and the trial court's instructions regarding expert testimony, we conclude that the probative value of the testimony outweighed its prejudicial effect. See Rule 403, Ala. R. Evid.
For these reasons, the trial court properly admitted Lamont's print identification testimony.

B.
In his reply brief, the appellant also contends that the trial court erred in admitting Lamont's testimony because the State allegedly acted improperly in not preserving and/or documenting the palm print evidence for independent analysis. Lamont testified that the blood on the countertop had degraded over time and that he could not observe as much detail at trial as he could when he made his identification. Accordingly, the appellant asserts that he was prejudiced because he could not subject the print to testing to establish that there was not a positive match and because there were not any photographs, *423 notes, or diagrams that counsel could use to rebut Lamont's testimony.
The following review of the various pretrial and trial proceedings regarding the palm print evidence may be helpful to an understanding of this argument:
On November 19, 2002, the appellant filed a motion to inspect, examine, and test all physical evidence, including print evidence. On November 22, 2002, the trial court ordered the State to produce the requested evidence or file an objection within 14 days.
On February 14, 2003, the appellant filed a motion to continue a hearing on his motion to suppress the palm print evidence, citing recent discovery from the State that had given rise to new issues. During a motion hearing on February 20, 2003, defense counsel stated, "Recently we were finally able to see the physical evidence that was seized in connection with this investigation. . . . But in reviewing the matters and the items that were seized as physical evidence in the case and discussing those with the State and then discussing those with our client, some defense issues have arisen that we need to clear up, and we can't do that at this point." (R. 15-16.) During that same hearing, the State indicated that it had complied with the order and that defense counsel had had an opportunity to inspect the physical evidence the State knew about. Regarding discovery by the defense, the State also assured the trial court and defense counsel that defense counsel had seen everything the State had at that point and that that would continue to be the policy until the trial started.
The case action summary sheet in this case indicates that, on March 11, 2003, the defense filed a "Motion for court order for State to make available fingerprint/palm print comparison material to defendant's investigator"; that, on March 13, 2003, the trial court entered an "Order to allow defendant's investigator access to fingerprint evidence"; that, on June 23, 2003, the defense filed a "Motion for court order for the State to produce the photos of the bloody palm print and the defendant's prints which was used for comparison by the State expert"; and that, on August 15, 2003, the defense filed a "Motion to suppress palm print evidence." (C.R. 5-6.)[2]
During a motion hearing on May 16, 2003, the prosecutor indicated that palm print evidence had been provided to the defense, stating, "Don McVeigh has been provided an opportunity to review all of the items." (R. 78-79.) During that hearing, defense counsel also indicated that they had seen the physical evidence in the case. (R. 89-90.)
During a subsequent motion hearing, apparently on July 11, 2003, the trial court and the parties discussed the motion to produce photographs of the bloody palm print and the appellant's prints. At that time, the prosecutor indicated that the State had produced the photographs that were taken at the crime scene. Defense counsel then stated that he understood that Lamont had taken a photograph of the bloody print to preserve it because the print would degrade over time and that Lamont had used that photograph to make a comparison to the appellant's prints. In response, the prosecutor stated, "As far as those items, I know their expert has been allowed to view them because he went and met with Dan Lamont." (R. 103.) The prosecutor also indicated that he would get in touch with Lamont and try to get the requested photographs for the defense, and the trial court ordered that the State produce the photographs within 14 days.
*424 On December 9, 2003, the trial proceedings started. That day, the defense asked for production of any policies and procedures the Huntsville Police Department had governing Lamont's comparison and identification. Later, during the State's direct examination of Lamont, the defense objected on several grounds, but did not object on the ground that the State had not documented or preserved the palm print. On cross-examination, Lamont testified that he did not make any notes about what he observed when he compared the bloody palm print on the countertop to the appellant's known prints. Rather, he stated that he made notes only about the date and time the prints were turned in to him, how many were turned in, the number of latent prints that were turned in, the fact that he made a comparison, and his conclusions about the palm prints matching and the latent prints not being sufficient to compare; that his supervisor signed the report; and that the report would have been sent to the sheriff's department. Lamont also testified that he did not take any photographs of the bloody palm print on the countertop or the appellant's known prints.
After Lamont had completed his testimony, the defense objected, arguing that his testimony was not admissible. One of the grounds defense counsel raised was that Lamont admitted that he had not followed the ACE-V standards or guidelines for identification because he had not made photographs of the prints. The defense further argued that, because the bloody palm print had degraded to the point that another comparison probably could not be made, and because Lamont had not made photographs of the prints, Lamont's reports and the procedures he followed were all the more important; that the defense had requested verification of any reports Lamont had made so that a defense expert could retrace, verify, and reproduce the steps Lamont had followed in making his identification; that the defense had been given a memorandum that was signed by a lieutenant with the Huntsville Police Department and that showed Lamont's conclusions; that Lamont had allegedly referred to notes and a report he made; that the defense did not get those notes or that report; and that, consequently, the defense's fingerprint expert could not verify anything Lamont did. Accordingly, defense counsel demanded a copy of Lamont's report and moved for a mistrial based on a lack of discovery of the report, which allegedly caused the defense not to be able to have an expert verify Lamont's conclusions. At that point, the prosecutors and Lamont assured the court that the memorandum that was signed by the lieutenant with the Huntsville Police Department and that had been provided to the defense previously was the only report Lamont had prepared. Thereafter, the trial court denied the motion for a mistrial and the objection to Lamont's testimony. The defense did not raise any further objections to the palm print evidence.
On January 7, 2004, the appellant filed a motion for a new trial, alleging, in part, that the trial court erred in denying his motion for a mistrial on the ground that the State had not given the defense a copy of Lamont's report.
The objections defense counsel made to Lamont's testimony after Lamont had completed his testimony were not timely and therefore did not preserve the appellant's argument for appellate review. Moreover, they did not appear to raise the issues of lack of preservation and documentation as independent substantive arguments against the admission of Lamont's testimony. Rather, he made brief reference to those issues only to support his discovery violation objection. Therefore, *425 we review this argument for plain error. See Rule 45A, Ala. R.App. P.
"The Alabama Supreme Court, in Ex parte Gingo, 605 So.2d 1237 (Ala.1992), adopted the United States Supreme Court's position in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the allegations that the state failed to preserve evidence potentially useful to the defense:
"`"[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood, 488 U.S. at 58, 109 S.Ct. at 337. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Youngblood, 488 U.S. at 57 (footnote), 109 S.Ct. at 337 (footnote), citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).'
"605 So.2d at 1240-41. Gingo additionally recognized that a defendant's right to due process can be violated when the loss or destruction is of evidence so critical to the defense that its loss or destruction makes the trial fundamentally unfair. Id. (citing Youngblood, 488 U.S. at 67, 109 S.Ct. at 342)."
May v. State, 710 So.2d 1362, 1369 (Ala. Crim.App.1997).
The appellant asserts in his response to the State's supplemental argument that Lamont testified that the print evidence could have been preserved by using tape or gelatin lifts. However, it appears from Lamont's testimony in this regard that he was referring to making lifts of latent, or invisible, prints rather than patent, or visible, prints. In fact, with specific reference to the bloody palm print on the countertop, he stated:
"As far as a print of this nature, which you're bringing up, they left it on the surface. There's not much else they could have done to it there."
(R. 809.) Therefore, the record appears to refute this portion of the appellant's argument.
The appellant also asserts that the palm print could and should have been preserved through photography, and he repeatedly complains because Lamont did not photograph the palm print. Although Lamont did not photograph the bloody palm print, one of the investigators did photograph it at the crime scene. Further, the State introduced that photograph of the bloody palm print into evidence during the trial. In addition, it also introduced copies of the appellant's known prints and the portion of the countertop that had the bloody palm print on it.[3] Therefore, this portion of the appellant's argument is also refuted by the record.
Lamont testified that there was not much more the State could have done to preserve the bloody palm print. He also testified that the blood simply degraded over time. Thus, based on Lamont's testimony, it does not appear that the State acted in bad faith in not preserving the bloody palm print.
The appellant argues that he was prejudiced because the defense could not do independent testing and could not have its own expert review the procedures Lamont followed. However, he proceeded to trial, apparently without having conducted *426 independent testing and without reviewing the procedures Lamont followed. Although he objected on the first day of the trial because he did not have the Huntsville Police Department's guidelines for print identification, he did not raise any objection at that time on the grounds he now raises. Also, although he apparently requested permission to have the evidence independently examined and to review Lamont's notes and reports, he did not make the trial court aware that he had not been able to do so until after Lamont had testified. These factors weigh against any claim of prejudice, and they support the conclusion that having the bloody palm print independently examined and having Lamont's notes and procedures reviewed were not particularly material or critical to his defense strategy at trial.
From the record before us, it is clear that the State provided everything it had in connection with the palm print to the defense before the trial started; that the parties and the trial court repeatedly discussed the palm print evidence before the trial started; that the defense was well aware before the trial and before Lamont's testimony that the bloody palm print would degrade and, in fact, had degraded with time; and that the defense had access to the bloody palm print before the trial started. Also, at trial, the only time the defense mentioned its inability to conduct independent testing was in an untimely objection after Lamont had testified. Apparently, the defense's strategy at trial was to argue that Lamont's testimony was not admissible, as discussed in Part I.A. of this opinion, and to attempt to discredit Lamont on cross-examination. In this regard, we note that defense counsel did, in fact, extensively and thoroughly cross-examine Lamont, as set forth above. During the pretrial and trial proceedings, the appellant had ample opportunity to present any objection in this regard to the trial court, but apparently chose not to do so. Based on the record before us, we do not find that there was any plain error in this regard.

C.
The appellant further contends that the trial court should not have admitted Lamont's testimony and conclusions because Lamont's comparison allegedly was not reliable because he did not make and keep notes and because Lamont's conclusions were not verified. However, these are matters that went to the weight of Lamont's testimony, rather than to its admissibility. As set forth above, defense counsel extensively cross-examined Lamont about these matters. Also, defense counsel thoroughly argued these matters to the jury during closing argument. Therefore, the appellant's argument is without merit.
For these reasons, the trial court properly admitted Lamont's testimony.

II.
The appellant's second argument is that the prosecution improperly withheld witness statements from the defense. Specifically, he contends that, "[a]t trial, the defense argued and proved that the Madison County Sheriff's Department took statements from Mrs. Epps' family members that were never turned over to the defense." (Appellant's brief at p. 35.) He further contends that "the Sheriff's Department likely took statements from other witnesses who saw Mrs. Epps in the days before her murder." (Appellant's brief at p. 37.) Because he did not present the argument regarding statements from other witnesses to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
*427 During the defense's cross-examination of Rhonda Epps, the victim's daughter-in-law, the following occurred:
"[DEFENSE COUNSEL:] After thisafter you'd been notified of what happened to Ms. Epps, did you have an occasion to talk to any of the investigators with the Madison County Sheriff's Department?
"[WITNESS:] Yes, I did.
"[DEFENSE COUNSEL:] Okay. And did you and the other members of your family talk together with the sheriff's department?
"[WITNESS:] Yes, we did.
"[DEFENSE COUNSEL:] Can you tell me who those people would have been?
"[WITNESS:] I'll be quite honest with you, [defense counsel]. My memories of those few days are not very clear.
". . . .
". . . I remember going to Mr. Edger's office very late that night and I know my husband was with me.
". . . .
"[DEFENSE COUNSEL:] Now, do you recall whether you or your husband, Charlie, ever gave a statement, written or recorded, to Mr. Edger about just what you knew?
"[WITNESS:] Oh, I'm sure we did. I'm sure we did. I don't recall whether he wrote it down, and I don't think anything was recorded. I think we probably filled something out. I would have to tell you though, we were all in shock and my memories are verymy memory is very unclear about those hours.
"[DEFENSE COUNSEL:] But you
"[WITNESS:] I only remember being in Mr. Edger's office and him asking questions.
"[DEFENSE COUNSEL:] And you think you may have written something down along with some of the other members of your family?
"[WITNESS:] We may have."
(R. 965-66.)
Later, during the State's direct examination of Investigator Dwight Edger, the following occurred:
"[WITNESS:] One of the first things that you're concerned with on a crime scene is once you have made sure that the crime scene is secure is to begin your investigation by findingtrying to develop witnesses, and I started at the scene, of course, with the person who discovered the body and had called it in to the 911 center. And of course there were family members who responded to the scene. So those family members, I requested that they come to my office at Arcadia Circle and conducted interviews with those family members.
"[PROSECUTOR:] In fact, we all just heard from Ms. Rhonda Epps who was on the stand, and she apparently couldn't recall if she had ever provided you any written statements, her or any of the family members. Do you recall if any of them provided written statements to you?
"[WITNESS:] I made no request of them to put in writing their statements, no, sir.
"[PROSECUTOR:] But you did interview the Epps family members?
"[WITNESS:] Yes, sir, I did."
(R. 970-71.)
Finally, during the defense's direct examination of Liz Epps, the following occurred:
"[DEFENSE COUNSEL:] [W]hen you corresponded with [the appellant] in the Madison County jail, did you indicate *428 to him in writing that you and your family had to write out affidavits and give a deposition as to where you were on that weekend surrounding this whole incident?
"[WITNESS:] Yes.
"[DEFENSE COUNSEL:] I'll show you a letter which I have and ask if you can identify it?
"So, Ms. Epps, you and your family did write affidavits andwrote in a deposition I think is the way you put it?
"[WITNESS:] I know I did.
"[DEFENSE COUNSEL:] All right. And who did you do that with?
"[WITNESS:] Myself.
"[DEFENSE COUNSEL:] But at whose direction was that particular affidavit given?
"[WITNESS:] I think Mr. Edger asked us to.
"[DEFENSE COUNSEL:] So you know that you wrote an affidavit for Mr. Edger?
"[WITNESS:] Uh-huh. Yes, sir."
(R. 1056.)
Afterward, the following occurred:
"[FIRST DEFENSE COUNSEL:] Judge, Defense makes another motion, I guess, because here's another witness who said they wrote another affidavit to Investigator Edger that we've never been given a copy of. Something she corresponds with [the appellant] on now she comes to the witness stand and says she wrote an affidavit. We've never seen that.
"[FIRST PROSECUTOR:] We've already heard from Investigator Edger that he took no written affidavits or statements from the family.
"[SECOND PROSECUTOR:] This was inquired about during the discovery process.
"[SECOND DEFENSE COUNSEL:] That was. It was extensively inquired into, several motions as I recall about that and the witness distinctly remembersthe letter says deposition or affidavit and, you know, we would move for a mistrial for lack of discovery at this particular point.
"THE COURT: If I was satisfied that it existed, we could do something about it. I'm not satisfied it exists, the fact that she says she did it.

"[SECOND DEFENSE COUNSEL:] The fact that Mr. Edger says he didn't either, that is not dispositive of the fact she may have. The argument cuts both ways.
"[FIRST PROSECUTOR:] I can assure the Court we will always be at this juncture. We've covered it extensively with Dwight. He did not take any written statements from family members. He said I interviewed them all. But it will never exist. We can declare a mistrial and it still won't exist.
"THE COURT: You can call him in rebuttal.
"[FIRST PROSECUTOR:] No, sir. I've already asked him whether he did.
"THE COURT: Motion is denied."
(R. 1060-61) (emphasis added).
The appellant alleges that the witnesses made statements that may have included exculpatory or impeachment evidence. However, he has not established that any such statements exist, and he has not specified any information that he alleges was exculpatory or that could be used for impeachment.
A criminal defendant is entitled to discover documents and tangible things "(1) [w]hich are material to the preparation of defendant's defense; . . . (2) [w]hich are intended for use by the state/municipality as evidence at the trial; *429 or (3) [w]hich were obtained from or belong to the defendant." Rule 16.1(c), Ala. R.Crim. P. "To prove a Brady violation, a defendant must show that `"(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial."'" Freeman v. State, 722 So.2d 806, 810 (Ala.Crim.App.1998) (quoting Johnson v. State, 612 So.2d 1288, 1293 (Ala.Crim.App.1992)). In the Brady context, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Finally, with regard to discovery of exculpatory evidence, we have held:
"`A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [State's] files. See United States v. Bagley, 473 U.S. [667], at 675, 105 S.Ct. [3375], at [3379][, 87 L.Ed.2d 481 (1985)]; United States v. Agurs, supra, 427 U.S. [97], at 111, 96 S.Ct. [2392], at 2401[, 49 L.Ed.2d 342 (1976)]. Although the eye of an advocate may be helpful to a defendant in ferreting out information, Dennis v. United States, 384 U.S. 855, 875, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973 (1966), this Court has never heldeven in the absence of a statute restricting disclosurethat a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary. In the typical case where a defendant makes only a general request for exculpatory material under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 [10 L.Ed.2d 215 (1963)], it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance. See Weatherford v. Bursey, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977) ("There is no general constitutional right to discovery in a criminal case, and Brady did not create one").'"
Russell v. State, 533 So.2d 725, 727-28 (Ala. Crim.App.1988) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)).
In this case, the appellant has alleged that the State improperly withheld witness statements based solely on speculative testimony by the victim's family members. However, he has not presented anything other than pure speculation to support his allegations. Moreover, Edger specifically testified that he did not take written statements from the witnesses, and the trial court clearly believed his testimony. Finally, Rhonda Epps testified only to identify a photograph of the victim, and Liz Epps testified for the defense only about her relationship with the appellant, the location of her vehicle and the keys to that vehicle, and her parents' telephone records. Because the decision involved a credibility choice, we will not second-guess the trial court's decision in this regard. The appellant's bare, speculative allegations were not sufficient to warrant further review by the trial court. Cf. Ex parte Morrow, 915 So.2d 539 (Ala.2004); Ex parte Key, 890 So.2d 1056 (Ala.2003). Accordingly, we do not find that there was any error, plain or preserved, in this regard.

III.
The appellant's third argument is that the trial court should have redacted *430 portions of his videotaped third statement in which he made comments about the death penalty. Specifically, he contends that the comments were not relevant to his guilt; were more prejudicial than probative; confused the jury and improperly injected the concept of punishment during the guilt phase of the trial; and created a presumption of death. Although he objected and succeeded in having other portions of his statement redacted, he did not challenge these particular comments at trial. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
We have reviewed the videotape of the appellant's third statement, and we note that he mentions that he might get the death penalty and that he wants to be charged and put to death. When quoted out of context, these comments could appear to be prejudicial. However, when they are viewed in the context of the appellant's entire statement, they appear to be genuine expressions of emotion and remorse about his actions. In fact, he made several comments that indicated remorse during the latter part of the interview. The comments also indicate that the appellant was aware of the seriousness of the crime about which he was confessing. Further, the trial court instructed the jury not to consider punishment in reaching its guilt-phase verdict. Finally, it instructed the jury to base its penalty-phase recommendation on the aggravating and mitigating circumstances and not on passion, prejudice, or any other arbitrary factor. We presume that the jury followed the trial court's instructions. See Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995). Under these circumstances, we do not find that there was any error, much less plain error, in this regard.

IV.
The appellant's fourth argument is that he did not voluntarily make his inculpatory third statement to law enforcement officers. Specifically, he contends that he was substantially impaired by cocaine and alcohol and a lack of sleep when he made the statement. He further contends that the alleged lack of specific details in his statement and his actions after the interviewfalling asleep shortly thereafter, waking up yelling for a cigarette, and asking Edger afterward what he said during the interviewsupport his contention that he did not voluntarily make the statement.
During the suppression hearing, Investigator Dwight Edger of the Madison County Sheriff's Department testified that he responded to the crime scene at approximately 9:17 p.m. on May 22, 2001; that, during that evening, he learned that the appellant had been working on the victim's property and had used drugs; and that, based on that information, he decided to investigate the appellant more closely. He also testified that he first interviewed the appellant at 9:49 a.m. on May 23, 2001, at his office complex; that he videotaped the interview; that he advised the appellant of his Miranda rights, and the appellant waived his rights and agreed to talk to him; that no one made any threats against or promises to the appellant to get him to speak; that the appellant appeared to be lucid and to understand what was happening; and that the appellant left after the interview.
Edger testified that he interviewed the appellant a second time at approximately 1:11 a.m. on May 25, 2001, after the appellant had been arrested on an outstanding warrant or warrants; that he videotaped the interview; that he advised the appellant of his Miranda rights, and the appellant waived his rights and agreed to talk to *431 him; that no one made any threats against or promises to the appellant to get him to speak; that the appellant appeared to understand what was happening; that the appellant smelled of alcohol, but that they "had a viable conversation"; that he was familiar with the effects and symptoms of cocaine usage, and that he concluded from the appellant's demeanor and speech that he was lucid and could carry on a conversation under normal circumstances; that the appellant consented to a search of his vehicle and residence at that time; and that the appellant was returned to the jail. (R. 127.)
Edger testified that he interviewed the appellant a third time at approximately 11:15 a.m. on May 25, 2001, after the bloody palm print from the crime scene had been identified as being the appellant's; that he videotaped the interview; that he read the appellant his Miranda rights, and the appellant waived his rights and agreed to talk to him; that he did not make any threats against or promises to the appellant to get him to speak to him; that the appellant appeared to be lucid and to understand what was happening; that the appellant's eyes were a little red, but he did not notice anything unusual about the appellant's demeanor; that the appellant may have gotten a little rest since the previous statement; that he arrested the appellant for capital murder after that interview; and that the appellant laid on the chairs and went to sleep after the interview.
During the suppression hearing, the defense called Kevin Wistoft, who was arrested the same day the appellant was arrested. Wistoft testified that he heard the appellant "hollering" for a cigarette for two hours; that he was familiar with how people act when they are drunk and when they are using cocaine; that the appellant appeared to be "highly intoxicated" on some substance; and that the appellant could not have understood what was happening to him and where he was. (R. 142, 143.)
During the suppression hearing, the defense also called Mark Barber, the appellant's brother. Barber testified that, late on May 24, 2001, or early on May 25, 2001, Investigator Ergle of the Madison County Sheriff's Department contacted him and asked him if he knew where the appellant was; that he called the appellant on his cellular telephone; that he told the appellant that the investigator wanted him to call him and gave him the investigator's number; that the appellant was incoherent, mumbled, and could not tell him anything; and that, in his opinion, the appellant was under the influence of something. Finally, he testified that, when he had questioned the appellant on other occasions, the appellant had told him what he wanted to hear to be left alone.
Finally, during the suppression hearing, the appellant testified that officers approached him where he was working on Wednesday, May 23, 2001; that he went with them to the sheriff's department; that, while he and his brother were there, someone mentioned that the victim had been beaten to death and that an object might have been used; and that he and his brother subsequently left. Later that day, he bought a twelve-pack of beer and $100 worth of cocaine, and he stayed at his house and drank the beer and used the cocaine. Around 7:00 p.m., he bought $50 worth of cocaine and then went home for the night and drank and used the cocaine. He also testified that he slept only about one hour around 4:00 a.m.
The appellant testified that he got up early on May 24, 2001, and got a message from Liz Epps between 6:00 a.m. and 7:00 a.m.; that he ran some errands and bought some more beer and about $100 *432 worth of cocaine around 8:00 a.m.; that he went home and drank and used cocaine; that he ran some more errands, spoke to Liz, and went back home; that he continued to drink and use cocaine; that he left and bought $150 worth of cocaine and some beer and wine; that he called a girl and checked into a motel; that he used the cocaine, and the girl met him at the motel about 30 minutes later; and that they left and bought drugs and beer several times before his brother called. Late in the evening or early the next morning, sheriff's deputies arrived at the motel and arrested him on a warrant.
The appellant testified that, when he drinks alcohol, he drinks a lot, smokes a lot of cigarettes, and says things to get his own way. He also testified that, when he uses cocaine, he says and does things he would not normally say and do. He further testified that, when he was arrested at the motel, he may have had only two hours of sleep in two days; that he had not eaten on Wednesday; and that he "was pretty wasted" and had thrown up just before the officer arrived. (R. 176.)
The appellant testified that he did not remember talking to Edger after he was arrested; that he did remember waking up in the interview room between two chairs and asking for Edger and a cigarette; that he was intoxicated during both the second and third interviews; and that he does not believe he was aware of what he was saying during the second and third interviews. He also testified that he had reviewed the videotapes of the interviews; that he did not remember answering Edger's questions; and that he does not believe he understood the Miranda rights waiver even though he signed it. The appellant further testified that, when he uses cocaine the way he was using it before he was arrested, he gets "a real wicked rush . . ., and within fifteen minutes it subsides"; that he goes up and comes down; and that, afterward, he is lethargic, tired, confused, irritable, and cannot think straight. (R. 181.) Finally, he testified that he last ingested cocaine within two hours of the time he was arrested.
On cross-examination, the appellant admitted that he remembered very specific details about what happened until he was arrested. However, he contended that everything caught up with him when he was arrested and he did not remember the interviews. Further, although his signature on the waiver of rights forms matched his signature on checks he had signed at other times, he asserted that he was intoxicated when he signed those checks too. Finally, he contended that the cocaine could have made him appear to be coherent during the interviews.
"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, *433 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim. App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added). Thus, to determine whether McLeod's confession was improperly induced, we must determine if his will was `overborne' by an implied promise of leniency.
". . . .
". . . Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See Gaddy, 698 So.2d at 1154 (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
McLeod v. State, 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted).
The Legislature has defined "intoxication" to include "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 13A-3-2(e)(1), Ala.Code 1975.
"In order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made. Moore v. State, 488 So.2d 27 (Ala.Cr.App.1986); Moore v. State, 415 So.2d 1210 (Ala.Cr.App.), cert. denied, 415 So.2d 1210 (Ala.), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982), and cases cited therein. `Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.' Tice v. State, 386 So.2d 1180, 1185 (Ala. Cr.App.), cert. denied, 386 So.2d 1187 (Ala.1980). See also Palmer v. State, 401 So.2d 266, 268 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).
"The voluntariness of an alleged confession is a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Tice v. State, supra; Garrison v. State, 372 So.2d 55 (Ala.Cr.App.1979). The degree of intoxication which would affect the *434 voluntariness of a statement is a question of fact initially addressed to the trial court and, depending upon its ruling, then to the jury for its consideration. Tice v. State, 386 So.2d at 1185."
Hubbard v. State, 500 So.2d 1204, 1218 (Ala.Crim.App.), aff'd, 500 So.2d 1231 (Ala. 1986). Further, "`[m]ere emotionalism and confusion do not dictate a finding of mental incompetency or insanity' so as to render a statement inadmissible." Callahan v. State, 557 So.2d 1292, 1300 (Ala. Crim.App.), aff'd, 557 So.2d 1311 (Ala.1989) (quoting Sullivan v. Alabama, 666 F.2d 478, 483 (11th Cir.1982)). Finally,
"`[c]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.' Atwell v. State, 594 So.2d 202, 212 (Ala.Cr.App. 1991), cert. denied, 594 So.2d 214 (Ala. 1992). `[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.' Jackson v. State, 589 So.2d 781, 784 (Ala.Cr.App. 1991) (citations omitted)."
Rutledge v. State, 651 So.2d 1141, 1144-45 (Ala.Crim.App.1994).
Under the totality of the circumstances in this case, we conclude that the appellant did voluntarily make the third statement to Edger. Our review of the videotapes indicates that, during the third interview, the appellant appeared to be more rested and alert than during the second interview; that his speech pattern was very similar to his speech pattern during the first interview; and that he appeared to be lucid and responsive to questioning.
In addition, although the appellant testified that he had used cocaine and alcohol on the day and evening before he spoke to Edger, the evidence does not indicate that, when he made his statement approximately ten to twelve hours after he was arrested, his mind and will were substantially impaired and he could not understand the meaning of his words. In fact, even the appellant admitted that the initial effects of cocaine subside within about fifteen minutes after use. Also, Edger testified that the appellant appeared to be lucid and to understand what was happening. In this regard, we note that the appellant's comments about the death penalty further indicate that he appreciated the severity of the crime to which he was confessing.
"There is no indication in the record that the appellant was intoxicated to the extent that he could not comprehend the meaning of his words. Therefore, the appellant's drug use was a circumstance to be considered by the jury, rather than a factor which would affect the admissibility of his statement."
Harris v. State, 580 So.2d 33, 36 (Ala. Crim.App.1990).
Also, even assuming that the appellant had not had much sleep before the third interview, he did not appear to be overly tired during that interview. "[W]hether a defendant was physically exhausted when he gave his statement is merely one factor to be considered by the jury in determining the credibility and weight to afford the statement." Powell v. State, 796 So.2d 404, 416 (Ala.Crim.App. 1999), aff'd, 796 So.2d 434 (Ala.2001).
Further, during the suppression hearing, the appellant went into great detail about events leading up to his arrest, including his actions during the previous days and the times he bought drugs and the amount of money he paid for the drugs the previous day and evening. However, he contended that he could not remember talking to Edger after he was arrested during the second and third interviews. Nevertheless, many of the details he included in his second and third statements *435 are consistent with and corroborated by the other evidence the State presented. (See Part V, infra.)
Finally, at the beginning of the third interview, the appellant tried to refute any implication that he had any motive, opportunity, or desire to hurt the victim. Even after Edger mentioned the bloody palm print, he adamantly denied any involvement in the offense. When he did finally confess, he did not appear to be simply going along with Edger and saying what Edger wanted him to say. Also, his comments about punishment and the effect on his and the victim's family showed his awareness of the severity of the situation.
Under these circumstances, we conclude that the appellant voluntarily made the third statement to Edger. Accordingly, the trial court properly denied his motion to suppress his statement.

V.
The appellant's fifth argument is that the trial court improperly admitted his statement into evidence without sufficient corroborating evidence. Because he did not first present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
"In Maxwell v. State, 828 So.2d 347 (Ala.Crim.App.2000), cert. denied, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002), this Court stated the following regarding the State's burden of proving the corpus delicti of a crime independent of an accused's confession:
"`It has been the rule in Alabama that the State must offer independent proof of the corpus delicti of the charged offense to authorize the admission of a defendant's confession or inculpatory statement. Robinson v. State, 560 So.2d 1130, 1135-36 (Ala. Cr.App.1989); see C. Gamble, McElroy's Alabama Evidence, 200.13 (5th ed. 1996). "`The corpus delicti consists of two elements: "(1) That a certain result has been produced, . . . and (2) that some person is criminally responsible for the act."' Johnson [v. State, 473 So.2d 607, 608 (Ala.Cr.App. 1985),] (quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (3d ed. 1977))." Spear v. State, 508 So.2d 306, 308 (Ala.Cr.App.1987). "`Positive, direct evidence of the corpus delicti is not indispensable to the admissions of confessions.'" Bracewell v. State, 506 So.2d 354, 360 (Ala.Cr.App. 1986), quoting Ryan v. State, 100 Ala. 94, 14 So. 868 (1894). "The corpus delicti may be established by circumstantial evidence." Sockwell v. State, 675 So.2d 4, 21 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).
"`"`Independent evidence of the corpus delicti need not be of such probative strength as that such evidence, standing alone, in the opinion of the trial or appellate court, would, ought to or probably would satisfy a jury beyond a reasonable doubt of the existence of the corpus delicti. Independent evidence of the corpus delicti may consist solely of circumstantial evidence. Whether the independent evidence tending to prove the corpus delicti is sufficient to warrant a reasonable inference of the existence thereof depends, of course, upon the particular facts of each case.'"

"`Bush v. State, 695 So.2d 70, 117 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (4th ed. 1991) (footnotes omitted in Bush); *436 see also Howell v. State, 571 So.2d 396 (Ala.Cr.App.1990). "The presentation of facts, from which the jury may reasonably infer that the crime charged was committed, requires the submission of the question to the jury." Watters v. State, 369 So.2d 1262, 1272 (Ala.Cr.App.1978), rev'd on other grounds, 369 So.2d 1272 (Ala. 1979).
"`Further, it is well settled that
"`"`inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti.'"

"`Bush, 695 So.2d at 117-18, quoting Bridges v. State, 284 Ala. 412, 417, 225 So.2d 821, 826 (1969); see also Bracewell, 506 So.2d at 360; Spear, 508 So.2d at 308. "While a confession is inadmissible as prima facie proof of the corpus delicti, it can be used along with other evidence to satisfy the jury of the existence of the corpus delicti." Bracewell, supra at 360; see also Howell, 571 So.2d at 397. As Professor Gamble has observed:
"`"The purpose of requiring proof of the corpus delicti, as a condition precedent to the admission of a confession, is to insure its trustworthiness. For this reason, there is some judicial language to the effect that corroborative evidence independent of the confession need not be sufficient to establish corpus delicti but must be sufficient independent evidence which would tend to establish the trustworthiness of the confession."

"`McElroy's Alabama Evidence, § 200.13 at 100 (5th ed. 1996). Finally, we have held:
"`"`Evidence of facts and circumstances, attending the particular offense, and usually attending the commission of similar offenses or of facts to the discovery of which the confession has led, and which would not probably have existed if the offense had not been committedwould be admissible to corroborate the confession. The weight which would be accorded them, when connected with the confession, the jury must determine, under proper instructions from the court.'"

"`Bush, supra at 118, quoting Matthews v. State, 55 Ala. 187, 194 (1876); see also Bracewell, supra.'
"828 So.2d at 357-58. `The term corpus delicti means the body or the substance of the crime and connotes the commission of the offense by the criminal agency of someone.' Tanner v. State, 57 Ala.App. 254, 264, 327 So.2d 749, 759 (1976). `Proof of the corpus delicti does not necessarily include evidence connecting [the] defendant with the crime.' Arnold v. State, 57 Ala.App. 172, 173, 326 So.2d 700, 701 (1976). See also C. Gamble, McElroy's Alabama Evidence, § 304.01 (5th ed. 1996) (`the term corpus delicti does not mean or include the guilty agency of the accused in the commission of the charged crime')."
Lewis v. State, 889 So.2d 623, 675-76 (Ala. Crim.App.2003).
In this case, the State presented independent circumstantial evidence that connected the appellant to the murder. First, the victim was last seen alive around 3:30 p.m. or 4:00 p.m. on Sunday, May 20, 2001. *437 Second, Liz Epps had left her vehicle and the keys to her vehicle at the Epps' farm a few days before the victim was killed. Third, when Beedard left the Epps' farm around 7:00 p.m. on Sunday, May 20, 2001, he saw Liz Epps' vehicle at a guest house, but he had not noticed the vehicle between 3:30 p.m. and 4:00 p.m. when he arrived. Fourth, Braswell testified that, on Sunday, May 20, 2001, the appellant's van was gone when she returned from church around noon; that the appellant called her between 3:00 p.m. and 4:00 p.m. to get her to cash a check; that, around 4:00 p.m., she loaned the appellant some money, and he left; that, around 8:00 p.m., the appellant called her, said that he was on his way home in Liz's vehicle, said that his keys were in his van, and asked her to open the door for him; that the appellant arrived in Liz's vehicle a few minutes later and said that he was going to take a shower and then go to a movie with Liz; that the appellant left about 8:30 p.m.; and that, about 9:30 p.m., the appellant returned in his van. Fifth, there were indications of blood in Liz Epps' vehicle. Sixth, some of the victim's wounds were consistent with having sustained blows to the head and some were consistent with having been hit with a claw hammer. Seventh, there were many blood spatters in the area where the victim was killed. Eighth, a portion of the appellant's palm print was found in the victim's blood on a nearby countertop. Ninth, Braswell testified that, when she spoke to the appellant on Wednesday, May 23, 2001, the appellant told her that the victim had been beaten to death, and he appeared to be very nervous. This evidence was sufficient to establish the trustworthiness of the appellant's confession. Therefore, we do not find that there was any error, much less plain error, in this regard.

VI.
The appellant's sixth argument is that the prosecutor improperly commented on his decision not to testify. Because he did not present this objection to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
"`[O]nce a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution.' Wherry v. State, 402 So.2d 1130, 1133 (Ala.Cr.App.1981). `In determining if a prosecutorial remark impairs the integrity of the defendant's right not to testify the test is whether the defense can show that the remark[, given the context in which it was made,] was intended to comment on the defendant's silence or was of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence.' United States v. LeQuire, 943 F.2d 1554, 1565 (11th Cir. 1991), cert. denied, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992)."
Ex parte Davis, 718 So.2d 1166, 1173 (Ala. 1998).
In judging a prosecutor's closing argument, the standard is whether the argument "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. *438 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)."
Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). Further,
"`[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, . . . each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala. 1991). `In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr. App.1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala. Crim.App.1992), aff'd, 628 So.2d 1004 (Ala. 1993).
During the State's initial closing argument, the prosecutor stated:
"And it's the last piece of evidence, I assume they would not[] want to talk about much, which is that confession. All they have to say was he's intoxicated."
(R. 1083.) Before that portion of the closing argument, the prosecutor had addressed the evidence in the case, reminded the jury that defense counsel had argued during his opening argument that there are two sides to every story, and summarized and attempted to refute the defense's allegations regarding various evidence the State had presented. Immediately after the above-referenced comment, the prosecutor continued:
"Now, you had an opportunity to observe that confession and it's in evidence for you to observe again. And you can observe his level of intoxication. And it's interesting that he didn't, when initially picked up from that hotel room and interviewed within an hour at 1:00 in the morning when presumably most of whatever is in his system is in his system, he doesn't confess. Some ten hours later, ten hours that he's been in custody. They don't pass out drugs up in the Madison County jail. Ten hours later that he confesses, but you can see the tape."
*439 (R. 1083-84.) Thus, the prosecutor was commenting on the evidence, urging the jury to review the videotape of the confession for itself, to observe the appellant on the videotape, and to reject the defense's contention that the appellant was intoxicated when he made the statement. When viewed in context, the prosecutor's argument was not "`of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence.'" Davis, supra. Therefore, we do not find that there was any error, much less plain error, in this regard.
During the State's rebuttal closing argument, the prosecutor stated:
"And Dwight said, you think, why would an innocent man confess. I almost feel ridiculous talk[ing] about it though. Why would he? Can you imagine any circumstance where an innocent man decides to confess to a murder he didn't do and a robbery he didn't do? I'll confess it. Why would he? You can't answer that."
(R. 1129.) Previously, during his closing argument, defense counsel had argued:
"I got to thinking to myself, you know, as people, have you ever said things that either you didn't know, didn't remember, didn't mean to say, didn't want to say, and I'm just asking this question and I just want you to follow it. Okay. I'm going to tell you a little bit of just a small story. You know, I know back a long, long time ago I had a friend. And we all went to this certain school. They'd come and come home from school and there was a bully in the neighborhood. Okay. Well, this particular bully was justI'm going to leave it at that. He was a bully. We all know what the definition of a bully is. Well, the time had come where bullying time is over. This guy is getting his due. So his homework and his book bag. Well, the next thing that happened they took some gasoline. They put the gasoline on the book bag, got some matches, lit the book bag. The book bag gets on fire and somebody panics. Kicked the book bag. The book bag goes into a yard, lights the yard up, and wouldn't you know it, there's that sixty-two footnot quite sixty-two foot, but there's a very nice boat in the back yard that just goes up in flames.
"Well, one of the individuals involved in the case, it was right after Christmastime, had just gotten an awful lot of pretty cool presents that all of us would have just loved to have. His parents were able to afford those kinds of things. And I go over at the house and there's some other friends over at the house and the question is posed, now look what I did. All right. I just want y'all to listen to me. I'm just telling you this foryou'll hear something in a minute. And I know that Melissa and I could hearone of my friends and I could hear him say, `[N]ow, look, you remember the go-cart and the Mongoose bicycle that the kids got last Christmas. Those things are fixing to go in the trash can. I just want to know what happened. Just tell me. You burned it, didn't you, you burned it? If you tell me, it's going to be okay. It will be all right, no big deal. We'll make everything okay. Just tell mejust tell me you did it and you're fine.' Okay. `Yes, sir, I did it.' That was a whole lot easier for my friend than to sit down and explain it and tell them what happened.
"Had he maybe said, `[Y]ou know, little Jimmy was the one that did it. I just saw it, I don't have any idea. I don't have any idea.' But just to agree and to sit there and talk to him, he knew his go-cart was safe, he knew his Mongoose bicycle was safe, and he knew he was *440 safe, but he told him what he wanted to hear.
"Now, I offer that [to] you for no other purpose other than for you to consider that. Because when you take the tape, there are things in that tape that don't make sense."
(R. 1094-96.) Also, immediately before the comment about which the appellant now complains, the prosecutor stated:
"But, you know, the confession itself, like I say, it's a fascinating piece of video. I urge you to go back and watch it. I really do. But, you know, you look at it and if the defense's theory is somehow and [defense counsel] had given a story . . . about the boy in the book bag burning, and I thought it was pretty good. But in his story the boy confesses because he didn't want to lose his bike and his go-cart. That was never the position the Defendant was in. The Defendant was confessing and knowing that he was losing the bike and the go-cart. So the story didn't exactly fit anything here. He was never coerced in any way. Never promised anything in any way. Dwight Edger got to the bottom of it because he stayed after him."
(R. 1128-29.)
After reviewing the prosecutor's comment in the context of the entire closing arguments, we conclude that it was not "`of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence.'" Davis, supra. Rather, we conclude that it was simply a permissible comment on the evidence and reply-in-kind to the defense's implications that the appellant simply told Edger what he wanted to hear. "`[A] prosecutor has the right to "reply in kind" to statements made by defense counsel in the defense's closing argument.' Ex parte Musgrove, 638 So.2d 1360, 1369 (Ala.1993), cert. denied, Rogers v. Alabama, [513] U.S. [845], 115 S.Ct. 136, 130 L.Ed.2d 78 (1994)." Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995). Therefore, we do not find that there was any error, much less plain error, in this regard.

VII.
The appellant's seventh argument is that the prosecutor improperly shifted the burden to him to prove his innocence. As he did in the previous argument, the appellant complains about the following excerpt from the State's initial closing argument:
"And it's the last piece of evidence, I assume they would not[] want to talk about much, which is that confession. All they have to say was he's intoxicated."
(R. 1083.) Because he did not present this objection to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
We addressed a similar contention in Broadnax v. State, 825 So.2d 134, 184-85 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), as follows:
"According to Broadnax, the prosecutor, during his first guilt-phase closing argument improperly shifted the burden of proof to him in the following portion of his argument:
"`And he's got two fine attorneys. And what I want you to be thinking the whole time they're up here is: Are they giving me another reasonable explanation for all of this? Are they explaining this in a reasonable way? Does it make sense, or is it like that little boy with the cookie stains on his mouth saying that Martians beamed into the kitchen and took that bite out of the cookie? I mean, I don't know what their story is. Is it that this white guy that he supposedly sold these boots to a year before was *441 picked up [as] a hitchhiker by Jan and killed her. And then, in the meantime, had broken into work release and stole some of his uniforms and then brought them back into work release, with his boots and uniforms and framed him? And if so, what is the person's motives? Look at whether they provide you with a reasonable explanation.'
"(R. Vol. VII at 161-62.) Broadnax did not object at trial to the prosecutor's comments; therefore, our review is limited to plain error. Rule 45A, Ala. R.App. P.
"`"`This court, in recognizing the government's burden and obligation of proving guilt beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof. See Duncan v. Stynchcombe, 704 F.2d 1213, 1216 (11th Cir.1983). Such prosecutorial misconduct, if "so pronounced and persistent that it permeates the entire atmosphere of the trial," requires reversal. United States v. Alanis, 611 F.2d 123, 126 (5th Cir.), cert. denied, 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980) (quoting United States v. Blevins, 555 F.2d 1236 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978)). Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury might draw from it and the impermissible practice of arguing suggestions beyond the evidence. See Houston v. Estelle, 569 F.2d 372, 380 (5th Cir.1978). Additionally, prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence. See [In re] Winship, 397 U.S. [358,] at 364, 90 S.Ct. [1068,] at 1072[, 25 L.Ed.2d 368 (1970)]. We reaffirm the former Fifth Circuit's position that "the limits of proper argument find their source in notions of fairness, the same source from which follows the right to due process of law." Houston, 569 F.2d at 380.'

"`"United States v. Simon, 964 F.2d 1082, 1086 (11th Cir.1992)."

"`DeBruce v. State, 651 So.2d 599, 604 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994).'

"Wilson v. State, 777 So.2d at 894.
"After reviewing the state's closing argument in its entirety, we conclude that the state did not attempt to shift the burden of proof to Broadnax. There is no suggestion from the above-quoted argument that Broadnax had an obligation to produce any evidence or to prove his innocence. The prosecutor merely asked the jury to consider the evidence presented and to determine whether the evidence established reasonable doubt as to Broadnax's guilt. Moreover, the trial court, at the conclusion of the closing arguments, instructed the jury as to the state's burden of proof and Broadnax's presumption of innocence. Thus, we reject Broadnax's argument and conclude that no reasonable juror would have construed the state's comment to mean that Broadnax had any burden of proof. No plain error occurred."
Similarly, in this case, the prosecutor did not suggest that the appellant was obligated to produce evidence or prove his innocence. Rather, as set forth in Part VI of this opinion, the prosecutor was commenting on the evidence, urging the jury to review the videotape of the confession *442 for itself, to observe the appellant on the videotape, and to reject the defense's contention that the appellant was intoxicated when he made the statement. Further, the trial court instructed the jury as to the State's burden of proof and the appellant's presumption of innocence. Therefore, we conclude that reasonable jurors would not have construed the argument to mean that the appellant had any burden of proof. Accordingly, we do not find that there was any error, much less plain error, in this regard.

VIII.
The appellant's eighth argument is that the prosecutor improperly vouched for the credibility of his witnesses. During the State's rebuttal closing argument, the prosecutor stated:
"But when you look through this and you look at Dan Lamont, and they were on him, I think we all came away with a feeling that Dan Lamont is an upright, qualified fingerprint examiner."
(R. 1121-22.) The defense objected, but the trial court overruled his objection. Subsequently, the prosecutor stated:
"Let me say something briefly about the investigation of this case. This case lent itself to a really clear, concise picture for you all as to the investigation. And this is an overwhelmingly strong case because of that man seated over there, Investigator Edger. And I don't have to tell y'all about Investigator Edger because you know him from being here in court and from watching those videotapes. And, you know, that was a first rate professional investigation. And they know it too the truth be known. But, you know, the confession itself, like I say, it's a fascinating piece of video. I urge you to go back and watch it. I really do. But, you know, you look at it and if the Defense's theory is somehow and [defense counsel] had given a story . . . about the boy in the book bag burning, and I thought it was pretty good. But in his story the boy confesses because he didn't want to lose his bike and his go-cart. That was never the position the Defendant was in. The Defendant was confessing and knowing that he was losing the bike and the go-cart. So the story didn't exactly fit anything here. He was never coerced in any way. Never promised anything in any way. Dwight Edger got to the bottom of it because he stayed after him."
(R. 1128-29) (emphasis added). The appellant complains about the emphasized portion of the above argument. However, because he did not object at trial to the statement about which he now complains, we review it for plain error. See Rule 45A, Ala. R.App. P.
As we stated in DeBruce v. State, 651 So.2d 599, 610-11 (Ala.Crim. App.1993), aff'd, 651 So.2d 624 (Ala.1994):
"A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. `[P]rosecutors must avoid making personal guarantees as to the credibility of the state's witnesses.' Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
"`"Attempts to bolster a witness by vouching for his credibility are normally improper and error." . . . The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. *443 . . . This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. . . . Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.'

"United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984)."
The prosecutor's statements did not amount to vouching for the credibility of his witnesses. During his closing argument, defense counsel challenged Lamont's testimony, arguing repeatedly that his findings were subjective and that his conclusion was "junk." (R. 1098, 1099.) He also argued that Edger improperly focused his efforts on the appellant and did not conduct a thorough investigation. Viewing the prosecutor's statements in the context of the entire closing arguments, we conclude that they were appropriate comments on the evidence and replies-in-kind to defense counsel's arguments regarding Lamont's testimony and Edger's investigation. Therefore, we do not find that there was any error, plain or preserved, in this regard.

IX.
The appellant's ninth argument is that his rights were violated because the jurors saw him in shackles and handcuffs in the hallway and saw him in handcuffs during his videotaped statements. As an initial matter, we note that, contrary to his assertions in his briefs to this court, the appellant was wearing handcuffs only during the third videotaped statement. However, because he did not object at trial to the jury seeing him in handcuffs during the third videotaped statement, we review that contention for plain error. See Rule 45A, Ala. R.App. P.
After the jury retired to deliberate and a recess was taken, the following occurred:
"[DEFENSE COUNSEL]: Judge, the Defense needs to make a motion for a mistrial, the reason being on the way down as the sheriff's department brought [the appellant] down there were three jurors standing in the outside of Judge Hamilton's courtroom standing there talking, and I heard the elevator door open up and I heard the noise coming from the chains on [the appellant's] legs and I got up and walked that way and tried to stop it, tried to get in front of them so I could prevent them from walking in front of the jurors. They stopped, they happened to stop right in front of where the jurors were. The jurors got a good look at [the appellant] with his hands in cuffs and his legs in cuffs and the noise it was making. It was extremely prejudicial to [the appellant], especially at this critical stage of the trial and the proceedings, and I think at this time we would ask the Court to declare a mistrial. [The appellant's] rights have now been prejudiced by them seeing him in that condition.
"THE COURT: Do you want to respond?
"[PROSECUTOR]: No, sir, Judge. Only to say I think it's been pretty obvious from looking at the taped interview with Dwight Edger where he informs the [appellant] that you're being locked up for capital murder and there won't be any bond and you'll sit in jail until you're tried. In addition, out of necessity we have sheriff's department personnel who are always in close proximity to [the appellant] here in the courtroom in front of the jury that he has suffered no different kind of harm *444 from one incidental incident of jurors seeing him in chains.
"THE COURT: All right. Motion denied.
"(IN THE PRESENCE OF THE JURY.)
"THE COURT: All right. Ladies and gentlemen, I have a question you have written out and given to me. I've reviewed it now with counsel and I'm prepared to answer that question. A couple of things I want to do before I answer your question. First of all, to ask each of you individually, and I won't call you by name, but I want to ask you as [a] group and individually, of course, if anything has occurred during your deliberations, during any break or at any other time that has caused you to be prejudiced or biased about this case in any way. In other words, your obligation is to follow the law as I give it to you and you determine what the evidence is from the witness stand. So the simple question is: Has anything compromised that for any of you. If it has in any was let me know immediately.
"(No response.)
"THE COURT: No response. All right."
(R. 1173-75.)
In Taylor v. State, 372 So.2d 387, 389-90 (Ala.Crim.App.1979), this court addressed a similar claim as follows:
"At the beginning of an afternoon session of the trial, the following occurred:
"`MR. HUGHES: Judge, if it pleases the Court to proceed, I think they are ready and Ms. Tillman is here. I would have a motion that I would ask to make out of the presence of the jury.
"`THE COURT: All right. Ladies and Gentlemen, once again I must ask you to please report to the jury room and we will send for you in just a moment.
"`(Out of the presence of the jury Mr. Hughes made the following oral motion.)
"`MR. HUGHES: Your Honor, if it pleases the Court, we would move for a mistrial on the following grounds: "`The jury, the entire jury panel was seated in the jury box when the Defendant was brought into the Courtroom. I am sure that it was not intentional on the Deputy's part, but at the time Eddie Taylor was handcuffed. The jury could not help but see that, they were here. All of them were present when they saw him. We feel that it would be prejudicial to his case, and there is not way to eradicate [sic] that. It gives impression that he is a violent individual, has all sorts of evil connotations. We feel that that cannot be corrected, and would move for a mistrial.
"`THE COURT: Deny your motion. Bring the jury back.'
"The possibility of some prejudice to defendant in what occurred as narrated by defendant's counsel is not to be ignored, but there is not a sufficient showing thereof to justify the conclusion that the trial court was in error in overruling defendant's motion for a mistrial. Appellant relies upon the sound general statement in Clark v. State, 280 Ala. 493, 496, 195 So.2d 786, 788 (1967):
"` . . . All of the authorities we have studied are agreed that to bring a prisoner before the bar of justice in handcuffs or shackles, where there is no pretense of necessity, is inconsistent with our notion of a fair trial, for it creates in the minds of the jury a prejudice which will likely deter them from deciding the prisoner's fate impartially. . . . '

*445 "Not to be overlooked, however, is the distinction made in Clark between handcuffing a prisoner in taking him to and from the court and in keeping him in handcuffs while he is being tried, unless there is reasonable ground for belief that such restraint is necessary to prevent his escape or his rescue.
"`Furthermore, it is not ground for a mistrial that an accused felon appear in the presence of the jury in handcuffs when such appearance is only a part of going to and from the courtroom. This is not the same as keeping an accused in shackles and handcuffs while being tried. Rhodes v. State, 34 Ala.App. 481, 41 So.2d 623.'

"Evans v. State, Ala. Cr.App., 338 So.2d 1033, cert. denied, 348 So.2d 784 (1977)."
In this case, the appellant did not wear handcuffs and shackles throughout the trial. Rather, he wore them going to and from the courtroom, and any jurors who saw him wearing handcuffs and shackles did so while he was going to and from the courtroom. Further, the trial court immediately asked the jurors if anything had occurred during deliberations, during any break, or at any other time that had caused any of them to be prejudiced or biased about the case in any way. None of the jurors indicated any such prejudice or bias. Under these circumstances, we conclude that the appellant's argument is without merit.
Also, during the third interview with Edger, the appellant is wearing handcuffs. In Gates v. Zant, 863 F.2d 1492, 1501-02 (11th Cir.1989), which the appellant cites, the United States Court of Appeals for the Eleventh Circuit addressed a similar situation as follows:
"Gates' other challenge to the videotaped confession is that its admission was unduly prejudicial because it portrayed him in handcuffs. As we have noted previously, although the handcuffs are not always visible, it is evident throughout the fifteen-minute tape that the defendant is handcuffed. We are aware of no cases which address the propriety of handcuffing during a videotaped confession. Nonetheless, the resolution of the issue is apparent from earlier cases addressing handcuffing in and around trials.
"The principal difficulty arising from shackling or handcuffing a defendant at trial is that it tends to negate the presumption of innocence by portraying the defendant as a bad or dangerous person. The Supreme Court has referred to shackling during trial as an `inherently prejudicial practice' which may only be justified by an `essential state interest specific to each trial.' Holbrook v. Flynn, 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). See also Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). This court recently has extended the general prohibition against shackling at trial to the sentencing phase of a death penalty case. Elledge v. Dugger, 823 F.2d 1439, 1450-52 (11th Cir.1987), modified, 833 F.2d 250 (1987), cert. denied, [485] U.S. [1014], 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).
"On the other hand, a defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs. Allen v. Montgomery, 728 F.2d 1409, 1414 (11th Cir.1984); United States v. Diecidue, 603 F.2d 535, 549-50 (5th Cir.1979), cert. denied sub nom. Antone v. United States, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); Wright v. Texas, 533 F.2d 185, 187-88 (5th Cir.1976); Jones v. Gaither, 640 F.Supp. 741, 747 (N.D.Ga.1986), aff'd without opinion, 813 F.2d 410 (11th Cir. *446 1987). The new fifth circuit is among those circuits which adhere to this rule. King v. Lynaugh, 828 F.2d 257, 264-65 (5th Cir.1987), vacated on other grounds, 850 F.2d 1055 (5th Cir.1988); see also United States v. Williams, 809 F.2d 75, 83-86 (1st Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1959, 2469, 2484, 95 L.Ed.2d 531, 877, 96 L.Ed.2d 377 (1987); United States v. Robinson, 645 F.2d 616, 617-18 (8th Cir.1981), cert. denied, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). In these latter cases, the courts generally have held that the defendant must make some showing of actual prejudice before a retrial is required.
"Thus, the case law in this area presents two ends of a spectrum. This case falls closer to the `brief viewing' end of the spectrum and requires a showing of actual prejudice before a retrial is required. The prosecution showed the fifteen-minute tape twice during several days of trial. The handcuffs were only visible during short portions of the tape.
"Gates has made no attempt to show that he suffered actual prejudice because the jury saw him in handcuffs. Our independent examination of the record also persuades us that he did not suffer any prejudice. Although defense counsel strenuously objected to the admission of the videotape, he did not object to the handcuffing in particular. He did not ask for a cautionary instruction or a poll of the jury. Furthermore, the videotape at issue here was taken at the scene of the crime, not at the police station. Thus, jurors likely would infer that handcuffing was simply standard procedure when a defendant is taken outside the jail. The viewing of the defendant in handcuffs on television rather than in person further reduces the potential for prejudice. In light of the foregoing facts, and the fact that Gates sat before the jury without handcuffs for several days during his trial, we conclude that the relatively brief appearance of the defendant in handcuffs on the videotape did not tend to negate the presumption of innocence or portray the defendant as a dangerous or bad person. We therefore conclude on the particular facts of this case that the handcuffing of Gates during the videotaped confession does not require a new trial."
In this case, although the appellant is clearly wearing handcuffs during the interview, because the videotape is blurry in places, the handcuffs are not plainly visible all of the time. Rather, they are more noticeable when the appellant is moving his hands. Also, as in Gates, the defense did not object to the admission of the videotape on this ground or ask for a cautionary instruction; the viewing was on television rather than in person; and the appellant did not wear handcuffs or shackles during the actual trial. Finally, the appellant had been arrested on an outstanding warrant and not on the capital murder charge at the time he made his statement. Therefore, under the facts of this case, we do not conclude that there was any plain error in this regard.

X.
The appellant's tenth argument is that the death-qualification process employed in capital cases produces a conviction-prone jury, conditions the jury toward guilt, disproportionately excludes minorities and women, and provides a basis for the prosecution to use peremptory challenges to remove additional veniremembers from the jury. He did not present his contentions regarding the disproportionate exclusion of women and the prosecution's use of peremptory challenges to the trial court. Therefore, we *447 review those contentions for plain error. See Rule 45A, Ala. R.App. P.
We addressed similar contentions in Sockwell v. State, 675 So.2d 4, 17-18 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995), as follows:
"The appellant also contends that the trial court erred in failing to quash the jury venire because, he argues, the prosecutor acknowledged that she had challenged by peremptory strikes those veniremembers who had expressed a hesitancy to impose the death sentence, and thus, he argues, she was seeking a jury more prone to convict a capital defendant. This argument is without merit.
"In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from `death qualification' of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev'd in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App. 1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).
"Moreover, it is not improper for a prosecutor to use peremptory challenges to remove veniremembers because they have expressed strong opposition to the death penalty, regardless of whether their opposition would be sufficient to support a challenge for cause. Fisher v. State, 587 So.2d 1027, 1036-37 (Ala. Crim.App.1991), cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992) (citations omitted)."
The appellant has made bare allegations regarding the death-qualification process, but he has not supported those allegations. Therefore, we do not find that there was any error, plain or preserved, in this regard.

XI.
The appellant's eleventh argument is that the trial court improperly precluded the jury from considering mitigating evidence. During the penalty phase of the trial, Alex Dryer, who had gotten to know the appellant through a jail ministry, stated that he did not want to see the appellant put to death. Also, Elizabeth Barber, the appellant's mother, stated that she did not want to see the appellant put to death and, in fact, begged that he not be put to death. The State objected, arguing that such opinions were not appropriate considerations for the jury, and asked for a limiting instruction, which the trial court agreed to give. Subsequently, during its penalty-phase oral charge, the trial court instructed the jurors, in part, as follows:
"In addition to those three mitigating circumstances that the Defense relies upon and puts before you that are enumerated by a specific code section, the Code of Alabama also provides that in addition to those three mitigating circumstances that I've now described to you, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the Defendant offers as a basis for a sentence of life imprisonment without parole as opposed to death and any other relevant mitigating circumstance which the Defendant offers as a basis for a sentence of life imprisonment without parole instead of death.
". . . .
"You have heard evidence with respect to the defendant's life and his character and his life since incarceration that was presented by the Defendant in *448 this sentencing hearing and that has been placed before you today, and it is your judgment and determination to use that as you see fit as it relates to mitigation in this case. You also heard statements from family of the Defendant asking that you not determine that death would be an appropriate penalty. And while they have the right to make that request, that in and of itself, requests of that type are not offered as mitigation in this case but can be taken as far as the life of the Defendant in that regard and what he has done in the past prior to the crime being committed and since his incarceration."

(R. 1316-18) (emphasis added).

A.
First, the appellant contends that, when it gave the emphasized portion of the above instruction, the trial court allegedly improperly instructed the jury to disregard the witnesses' desire to see him live. Because he did not present this specific argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
With regard to the opinions of friends and relatives concerning sentencing, we explained as follows in Taylor v. State, 666 So.2d 36, 51-53 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995):
"At the sentence phase of trial, the trial court properly refused to allow testimony from the appellant's family and friends requesting that the jury spare the appellant's life. We find that the action of the trial court did not prevent the jury from considering any mitigating evidence.
"The trial court sustained the objection of the prosecutor and refused to allow Reverend Norris Hilton, Pastor of Forrest Avenue Baptist Church, to respond to the question, `[W]hat are your feelings about whether Michael ought to receive death in the electric chair . . . or whether he ought to receive a sentence of life imprisonment without parole?' R. 1255, because to do so `invades the province of the jury.'
"The trial court refused to allow the appellant's father, Robert Taylor, to respond to the question, `Are you asking the jury to spare his life?' R. 1295.
"The trial court sustained the prosecutor's objection to the following question asked by defense counsel of the appellant's aunt, Betty McGriff, `Mrs. McGriff, are you asking this jury to spare Michael's life?' R. 1315. The trial court then informed defense counsel: `If you gentlemen can show me some law on that, that's fine, but I don't want that question asked again of any witness. . . . [M]y understanding of the law is that [that] is a question that invades the province of the jury and cannot be asked.' R. 1315-16, 1317.
"`[T]he opinion of a relative of a victim is irrelevant to the jury's determination of whether the death penalty should be imposed.' Robison v. Maynard, 943 F.2d 1216, 1217 (10th Cir.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991). See also Robison v. Maynard, 829 F.2d 1501, 1504-05 (10th Cir. 1987). Such testimony is `calculated to incite arbitrary response' from the jury. Robison, 829 F.2d at 1505.
"Although Payne v. Tennessee, 501 U.S. 808, 826-28, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), held that the Eighth Amendment does not prohibit the admission of `victim impact' evidence at the sentencing phase of a capital trial,

"`Payne merely put aside the bar to the introduction of and comment upon victim impact evidence which had been created in Booth [v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 *449 L.Ed.2d 440 (1987)], and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The Court did not expand the universe of admissible relevant mitigating evidence established by Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). . . . We cannot agree that Payne portends admissibility of any evidence other than that related to the victim and the impact of the victim's death on the members of the victim's family. Nothing said by the Court suggests the Court intended to broaden the scope of relevant mitigating evidence to include the opinion of a victim's family member that the death penalty should not be invoked. . . .
"`We can take cognizance of the Court's rationale that victim impact evidence relates directly to the harm resulting from a defendant's act. The Chief Justice stated:
"`"Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities."

"`Payne, 501 U.S. at 825, 111 S.Ct. at 2608. In this context, the desire of the victim's relative in no way constitutes relevant evidence because it does not relate to the harm caused by the defendant.'

"Robison, 943 F.2d at 1217-18. . . .
"Under Alabama law, nonstatutory mitigating evidence must be relevant.
"`In addition to the mitigating circumstances specified in section 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.'
"Ala.Code 1975, § 13A-5-52. `"[S]ubject only to the loose evidentiary requirement of relevance, capital defendants have a right to offer any evidence they choose on character or record or circumstances of the offense."' Clisby v. State, 456 So.2d 99, 101 (Ala.Crim. App.1983) (quoting Stanley v. Zant, 697 F.2d 955, 960 (11th Cir.1983)), cert. denied, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984).
"`Evidence is "relevant" if it logically relates to the ultimate, material inference in the case for which it is proffered.' J. Colquitt, Alabama Law of Evidence § 4.1 (1990). `"Evidence is relevant if it has any probative value, however slight, upon a matter at issue in the case." Phelps v. State, 439 So.2d 727, 736 (Ala.Crim.App.1983). "Evidence is relevant if it has any tendency to throw light upon the matter in issue, even though such light may be weak and fall short of demonstration." Austin v. State, 434 So.2d 289, 292 (Ala.Crim.App. 1983).' Brewer v. State, 644 So.2d 39 (Ala.Cr.App.1994). `In this State, evidence is relevant if it has any logical relationship to the purpose for which it is offered.' Rose v. State, 598 So.2d 1040, 1042 (Ala.Cr.App.1992).
"It is the holding of this Court that the opinion of the friends or relatives of the defendant that the defendant should not be sentenced to death is not a relevant mitigating circumstance for the jury to consider at the penalty phase of *450 a capital case. Compare McGahee v. State, 632 So.2d 976, 978 (Ala.Cr.App.), affirmed, 632 So.2d 981 (Ala.1993) (`The physical effects of electrocution are not an aspect of the appellant's character or record and are not relevant to any of the circumstances of the crime; and we conclude that this type of evidence does not constitute evidence of mitigation.'); Hinton v. State, 548 So.2d 547, 560-61 (Ala. Cr.App.1988), affirmed, 548 So.2d 562 (Ala.1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989) (`We interpret this section to limit mitigating evidence to that which assumes that the defendant committed the crime for which he was convicted. . . . This court therefore finds that polygraph results which indicate that the defendant is not guilty of the crime for which he is being sentenced are not relevant to either aggravating or mitigating circumstances and thus are inadmissible in a sentencing proceeding under § 13A-5-45(d).')."
(Footnote omitted.)
Based on this court's holding in Taylor, the opinions of Dryer and Barber about punishment were not relevant mitigating circumstances for the jury to consider during the penalty phase of the appellant's capital trial. Therefore, the trial court did not improperly restrict the jury's consideration of those opinions by giving the above-emphasized instruction. In fact, it appears that the trial court left open the possibility that the jury could give those opinions some consideration during its deliberations. Therefore, we do not find that there was any error, much less plain error, in this regard.

B.
Second, the appellant contends that the trial court improperly refused to instruct the jury on the concept of mercy, either by giving some or all of his requested instructions or by substituting its own instruction. Because he did not present this specific argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
We addressed and rejected a similar argument in Melson v. State, 775 So.2d 857, 896-98 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000), as follows:
"Melson contends that the trial court improperly refused his sentence-phase written requested jury instruction informing the jury that it could consider mercy in its sentence recommendation. (Issue VI in Melson's brief to this court.) Melson's requested jury charge number 32 read as follows:
"`Even if you find one or more aggravating circumstances beyond a reasonable doubt, you may impose a sentence of life in prison without possibility of parole for any reason. You need not find a mitigating circumstance in order to impose a sentence of life imprisonment without parole. Nothing in the law forbids you from extending mercy out of compassion or belief that life imprisonment is sufficient punishment under all the circumstances of this case.'
"(C. 287.) This charge was clearly an incorrect statement of the law, and the trial court properly refused to give it.
"In Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), we held that an almost identical instruction was properly refused by the trial court. In Rieber, we stated:
"`In Whisenhant v. State, 482 So.2d 1225 (Ala.Crim.App.1982), aff'd in part, 482 So.2d 1241 (1983), the court refused to give a similar charge. In Whisenhant, the defendant asked the *451 court to tell the jury that it could recommend mercy for the defendant regardless of whether any evidence of mitigating circumstances was preserved. In finding that the defendant's requested instruction was an erroneous statement of law, this court held:
"`"The correct principle underlying this issue is stated in [Beck v. State, 396 So.2d 645, 663 (Ala.19[80])] as follows:
"`"`The court shall instruct the jury that in determining whether to fix a punishment of death, the jury must weigh the aggravating and mitigating circumstances in determining whether to fix the punishment at death. The trial court shall instruct the jury to avoid any influence of passion, prejudice or other arbitrary factor while deliberating and fixing the sentence.'
"`"Clearly, it is the duty of the jury to weigh mitigating and aggravating circumstances in its decision. The jury is not free, as appellant's charge suggests, to arbitrarily ignore any factor, positive or negative, in arriving at the correct sentence.
"`"As well, we view Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), to have tacitly held that the availability of such a mercy option to the sentencing authority is not a constitutional requirement. As Mr. Justice White's concurring opinion in Proffitt points out, the sentencing authority in Florida is required to impose the death penalty on all first degree murderers as to whom the statutory aggravating circumstances outweigh the mitigating circumstances. Proffitt at 260 [96 S.Ct. at 2970]. This required imposition of the death penalty, regardless of mercy, passed constitutional muster in Proffitt, and is in keeping with the concern that arbitrary and capricious imposition of the death penalty be avoided. Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982)."
"`Whisenhant, 482 So.2d at 1236. See also Morrison v. State, 500 So.2d 36 (Ala.Crim.App.1985), aff'd, 500 So.2d 57 (1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987).'
"663 So.2d at 996. We also stated the following in Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998):
"`The United States Supreme Court in Boyde v. California, 494 U.S. 370, 377, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990), addressed this issue as follows:
"`"Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances `outweigh' the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence `in an effort to achieve a more rational and equitable administration of the death penalty.' Franklin v. Lynaugh, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988) (plurality opinion)."
"`We have rejected arguments in prior capital cases that the defendant is entitled to a jury instruction that *452 the jury has unbridled discretion to recommend a sentence of life imprisonment without the possibility of parole regardless of the evidence pertaining to aggravating and mitigating circumstances. See, e.g., Smith v. State, 581 So.2d 497 (Ala.Cr.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Morrison v. State, 500 So.2d 36 (Ala.Cr.App. 1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). In Williams v. State, supra, 601 So.2d 1062, 1081, we stated as follows:
"`"The appellant next argues that the trial court erred in failing to instruct the jury on `their unfettered option' to impose a sentence of life without parole. The jury may not recommend mercy without reason. See Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). The jury does not have an `unfettered option' to recommend a sentence of life without parole unless after weighing the aggravating and mitigating circumstances it finds that life without parole is warranted."
"`We find no merit in the appellant's contention that he was entitled to a jury instruction that the jury had an unfettered option to return a recommendation of life imprisonment without the possibility of parole regardless of "its calculus as to aggravators and mitigators." Kuenzel v. State, 577 So.2d at 520. No error was committed here, much less plain error.'
"710 So.2d at 1342; see also Gaddy v. State, 698 So.2d 1100, 1142 (Ala.Cr.App., 1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997); Trawick v. State, 698 So.2d 151, 161-62 (Ala.Cr.App.1995), aff'd, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997). The trial court properly refused Melson's written requested jury instruction number 32.
"Furthermore, contrary to Melson's assertion in his brief to this court, the trial court's instructions to the jury at the penalty phase of the trial were not `silent on the issue of mercy.' (Melson's brief, pp. 36, 38.) The record reflects that the trial court instructed the jury as follows:
"`A mitigating circumstance is anything about the defendant or the crime itself which in fairness and mercy, should be taken into account in deciding the appropriate punishment for this defendant. Even where there is no excuse or justification for the crime, our law requires consideration of more than just the basic facts of the crime; therefore, a mitigating circumstance may stem from any of the diverse frailties of human kind.
"`Mitigating facts are any facts relating to the defendant's age, character, education, environment, mentality, life and background, or any aspect of the crime itself which may be considered extenuating or reducing the defendant's moral culpability or making him less deserving of the extreme punishment of death by electrocution. You may consider as a mitigating circumstance any circumstance which tends to justify the penalty of life imprisonment without possibility of parole.

*453 "`You must consider all evidence of mitigation. Mitigation may be established by any evidence introduced by either party at either the guilt/innocent phase of this trial or this sentencing phase or both. The weight you give to a particular mitigating circumstance is a matter for your moral and factual judgment.'
"(R. 2137-38.) (Emphasis added.) For the reasons stated above, we find no error as to this claim."
We have reviewed the appellant's requested instructions and the trial court's entire penalty-phase oral charge. Based on our decision in Melson, we conclude that the trial court properly refused to give the appellant's requested instructions or any other instructions relating to mercy. Further, we note that the trial court thoroughly instructed the jury that the State had the burden of proving aggravating circumstances beyond a reasonable doubt; that the State must have proved at least one aggravating circumstance beyond a reasonable doubt before it could consider recommending death; that it must determine during its deliberations whether aggravating and mitigating circumstances existed; that aggravating circumstances are limited by statute, but that mitigating circumstance are not; that the defense was relying on three statutory mitigating circumstances; that the defense would be required to prove mitigating circumstances only by a preponderance of the evidence; that mitigating circumstances included "any aspect of a defendant's character or record and any of the circumstances of the offense that the Defendant offers as a basis for a sentence of life imprisonment without parole as opposed to death and any other relevant mitigating circumstance which the Defendant offers as a basis for a sentence of life imprisonment without parole instead of death"; that it must follow a standard process of weighing aggravating and mitigating circumstances; and that it was to "avoid any influence of passion, prejudice, or any other arbitrary factor while deliberating or fixing the sentence." (R. 1317, 1325.) Accordingly, we do not find that there was any error, much less plain error, in this regard.

C.
Third, the appellant contends that the trial court improperly refused to read to the jury a list of proposed nonstatutory mitigating factors he submitted. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
The appellant filed a list of proposed examples of nonstatutory mitigating evidence that he wanted the trial court to read to the jury during its penalty phase instructions. In addressing this request, the trial court stated:
"My feeling is still the same that to list those as mitigating factors would be to comment on the evidence. But I do not have a problem with the Defendant or counsel listing those and telling the jury that you contend that those are mitigating factors, then my charge to the jury will be anything you find to be a mitigating factor can be used by you in this deliberative process that you will go through, assuming that the State has not disproved it. So that's the way I'm going to handle that. I don't think I can do it otherwise than to be commenting on the evidence and putting a `stamp of approval' on this as a mitigating circumstance you must consider. I mean, the list . . . could go on ad infinitum.
". . . I'll hear from Defense on that suggestion by the Court. That's the way I would handle it. I am not going to limit you in using those. . . . "
*454 (R. 1280-81.) The appellant did not object to the trial court's proposal for handling the list. Moreover, the defense presented evidence regarding most of the nonstatutory mitigating circumstances on the list during its penalty-phase case. Finally, defense counsel listed and urged the jury to find those nonstatutory mitigating circumstances during his penalty-phase closing argument. Under these circumstances, we do not find that there was any error, much less plain error, in this regard.

XII.
The appellant's twelfth argument is that the trial court improperly allowed Edger to testify that the victim's murder was especially heinous, atrocious, or cruel when compared to other capital cases in which he had been involved. Specifically, he contends that the testimony "was nothing more than a declaration of the ultimate issue that the jury was required to determine beyond a reasonable doubt." (Appellant's brief at p. 80.) Because he did not first present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
The appellant also argues that Edger improperly speculated about the appellant's motive during his penalty-phase testimony. When explaining why he believed that the murder was especially heinous, atrocious, or cruel when compared to other capital cases in which he had been involved, Edger stated, in part:
"[The facts of another case do] not arise to the atrocities of something compared to this one because in this one, the offender in this case, the Defendant, took up close and personal a hammer and slaughtered this victim repeatedly with blows to her body for no other reason than to take what small amount of money he could get to purchase drugs with."
(R. 1214.) After two other witnesses testified, the appellant objected to Edger's testimony and moved for a mistrial. The trial court denied the motion, noting that evidence regarding the appellant's motive had already been presented during the guilt phase of the trial. Because the appellant's objection and motion for a mistrial were not timely, they did not preserve this argument for appellate review. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
We addressed a similar situation in Wilson v. State, 777 So.2d 856, 880-82 (Ala. Crim.App.1999), aff'd, 777 So.2d 935 (Ala. 2000), as follows:
"The appellant's third argument is that the reliability of the jury's death recommendation was destroyed when improper evidence was admitted in support of the aggravating circumstance that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. See § 13A-5-49(8), Ala.Code 1975. Initially, he contends that the State improperly elicited ultimate-issue testimony from law enforcement officers that, in their opinion and based on their observations, the offense was heinous, atrocious, or cruel. . . .
". . . .
". . . [W]e do not agree with the appellant's argument that the testimony of the law enforcement officers constituted improper testimony about the ultimate issue before the jury. As we stated in Smith v. State, 756 So.2d 892 (Ala.Cr. App.1997), aff'd, 756 So.2d 957 (Ala. 1999):
"`In determining whether a capital offense is especially heinous, atrocious, or cruel, the factfinder can compare the murder at issue with other capital crimes. The testimony of an experienced police officer who had investigated *455 many capital crimes could be invaluable in making such a determination.'
"Furthermore,
"`[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements.'
"§ 13A-5-45(d), Ala.Code 1975. Therefore, the ultimate issue rule did not apply during the sentencing proceedings, and the testimony was not improper on that basis. See Rule 1101(b)(3), Ala. R. Evid. Furthermore, although the officers incorrectly concluded that the execution-style nature of the killings established that they were heinous, atrocious, or cruel, their testimony was still relevant and probative. During direct examination, the prosecutor defined the terms `heinous,' `atrocious,' and `cruel' separately. He then asked the officers whether, in their opinion based on their law enforcement experience and their observations, these killings were heinous, atrocious, and cruel. Later, he asked additional questions about the execution-style nature of the killings. Therefore, the execution-style nature of the killings, combined with the testimony of the survivors about the torture the decedents suffered before their deaths, was relevant in determining whether the especially heinous, atrocious, or cruel aggravating circumstance applied. Therefore, the testimony of the officers was not improper.
"Finally, error, if any, in the admission of the testimony of the officers was harmless. See Rule 45, Ala. R.App. P. In its oral charge, the trial court instructed the jury on the correct standard to apply in determining whether the aggravating circumstance existed, stating as follows:
"`The second aggravating circumstance, as I understand it, that the State alleges in this case is that this capital offense was especially heinous, atrocious or cruel. We can understand that murder is in and of itself sometimes heinous and sometimes atrocious and sometimes cruel. It's sometimes all of those things. But in order to be an aggravating circumstance for the purpose of invoking the death penalty our law says that it must be especially so when compared to other capital offenses. The term "heinous" has been defined to mean extremely wicked or shockingly evil. The term "atrocious" has been defined to mean outrageously wicked and violent. The term "cruel" has been defined to mean designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. It has at times been defined as unnecessary torture.'
"(R. 1838-39.) The trial court also instructed the jury that it would ultimately decide whether the aggravating circumstance existed. As set forth throughout this opinion, there was overwhelming evidence from which the jury could conclude that the offense was especially heinous, atrocious, or cruel compared to other capital offenses. Finally, in its sentencing order, the trial court made the following findings about the applicability of this aggravating circumstance:
"`The capital offense was especially heinous, atrocious or cruel compared to other capital offenses. As noted above, some 19 rounds were fired. Prior to the discharge of the weapons, the victims were subjected to threats *456 and intimidation. Some were struck. At least two were struck with a bottle and one was stomped by the defendant. The victims were restrained at gunpoint and required to remove portions of their clothing. They were taunted and abused for a lengthy period of time. By any standard acceptable to civilized society, this crime was extremely wicked and shockingly evil. The defendant was unnecessarily torturous in his commission of the crimes. While the Court recognizes that all capital offenses are heinous, atrocious and cruel to some extent, the degree of heinousness, atrociousness and cruelty which characterizes this offense exceeds that which is common to all capital offenses.'
"(C.R. 263-64.) There is no indication that the jury or the trial court applied an incorrect standard in finding that this aggravating circumstance existed. The evidence more than adequately supports a finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Therefore, viewed in the context of the entire trial, error, if any, in the admission of the testimony of the officers was harmless. See Rule 45, Ala. R.App. P."
Based on our holdings in Wilson and Smith, it does not appear that either instance during Edger's testimony constituted an improper opinion about the ultimate issue in the case. Rather, it appears that the testimony was relevant to assist the jury in determining whether the especially heinous, atrocious, or cruel aggravating circumstance applied.
Moreover, error, if any, in the admission of Edger's testimony was harmless. See Rule 45, Ala. R.App. P. In its oral charge, the trial court instructed the jury on the correct standard to apply in determining whether the aggravating circumstance existed, stating as follows:
"The other aggravating circumstance that the State is asserting is that the offense was especially heinous, atrocious or cruel compared to other capital offenses. Again, that is one of the other specifically enumerated aggravating circumstances that a jury may consider if the jury is convinced beyond a reasonable doubt that it exists and the State would bear that separate burden of proof at this hearing to establish beyond a reasonable doubt that this offense was especially heinous, atrocious or cruel as compared to other capital offenses. With respect to that provision the term heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and violent. The term cruel means designed to inflict a high degree of pain with indifference to or even enjoyment to the suffering of others. Those are legal definitions of heinous, atrocious and cruel.
"However, it is not enough that the capital offense committed by the Defendant was heinous, atrocious or cruel as I defined those terms to you. The last part of that aggravating circumstance says that they must have been especially so when compared to other capital offenses. Brutal is not enough. The fact that the crime was committed brutally is not in and of itself an aggravating circumstance. The aggravating circumstance is specifically that it was especially heinous, atrocious or cruel as compared to other capital offenses. For a capital offense to be especially heinous or atrocious or cruel, it must have exceeded that which is normally present in other capital cases.
"For a capital case to be especially cruel, it must be a conscienceless or pitiless crime which was unnecessarily atrocious and torturous to the victim."
*457 (R. 1310-11.) The trial court also instructed the jury that it would ultimately decide whether the aggravating circumstance existed.
Also, during the final sentencing hearing, the trial court stated the following about the applicability of the especially heinous, atrocious, or cruel aggravating circumstance:
"The other aggravating circumstance . . . was that this murder was especially heinous, atrocious or cruel as compared to other offenses. And I find from the evidence that that aggravating circumstance does in fact exist. The evidence in the case including the photographs of Ms. Epps, the photographs of the scene of this crime leads me to conclude without reservation that the crime of [the appellant] was extremely wicked, shockingly evil, outrageously wicked and vile and cruel with the actions of the [appellant] designed to inflict a high degree of pain and fear in the victim with utter indifference to her.
"The description of the investigators as to the condition of the area where Ms. Epps was found shows clearly that this murder was committed in an extremely violent and cruel manner. And obviously all in this courtroom understand that any murder of a defenseless victim, Ms. Epps was certainly a defenseless victim, a person that knew [the appellant] by face, more than likely allowed him to enter without question because he knew her, was familiar with her and her family, had done work at her home. But the description of the investigators as to the condition of the area shows that it was committed in an extremely violent and cruel manner. The defensive wounds to both sides of Ms. Epps' hands leads one to the inescapable conclusion that she was aware of what was happening at the hands of the [appellant]. Was obviously at times facing him. At times probably on the ground while blows were continually inflicted."
(R. 1357-58.)
Finally, in its sentencing order, the trial court made the following findings about the applicability of the especially heinous, atrocious, or cruel aggravating circumstance:
"The capital offense was especially heinous, atrocious, or cruel as compared to other capital offenses. The Court reaches this conclusion based upon the following evidence:
"(a) The victim, Mrs. Epps, was alone and defenseless and of no physical threat to the Defendant.
"(b) The Defendant caused the death of Mrs. Epps while inflicting great fear and extreme pain and mental anguish prior to the infliction of the injury, which ultimately caused her death. There is no logical explanation for the Defendant's behavior except his indifference to this human life, and even his enjoyment of the suffering of this victim.
"(c) As stated previously in this order, the multiple blows by the Defendant with a claw hammer on the body of the victim show clearly that the death of Mrs. Epps did not occur quickly and mercifully; rather, the events that led to her ultimate death lead the Court to conclude, without reservation, that the crime of this defendant was extremely wicked, shockingly evil, outrageously wicked and vile and cruel, with the actions of the Defendant designed to inflict a high degree of pain and fear in the victim, with utter indifference to or even enjoyment of, the suffering of Mrs. Epps. Any murder of a defenseless victim is to some extent heinous, atrocious, *458 and cruel, but the degree of heinousness, atrociousness, and cruelty, with which this offense was committed, exceeds that common to other capital offenses.
"(d) The description of investigators as to the condition of the area of the home where Mrs. Epps was found shows clearly that this murder was committed in an extremely violent and cruel manner. Defensive wounds to both sides of Mrs. Epps' hands would lead one to conclude she received blows to one side of her hand, and then in effort to protect the side of her hand, previously injured, she turned her hands in the other direction in her continued attempts to ward off the blows to protect herself. One of the blows inflicted by the Defendant to the forearm of Mrs. Epps was of such severity that it fractured her right forearm."
(C.R. 273-74.)
The record does not indicate that the jury or the trial court applied an incorrect standard in finding that the especially heinous, atrocious, or cruel aggravating circumstance existed. Also, the evidence overwhelmingly supports a finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Therefore, viewed in the context of the entire trial, error, if any, in the admission of Edger's testimony was harmless. See Rule 45, Ala. R.App. P.

XIII.
The appellant's thirteenth argument is that the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), invalidated Alabama's capital sentencing scheme and requires that his death sentence be reversed.

A.
First, the appellant contends that the scheme is unconstitutional because the jury does not make all of the findings of fact that are necessary to support the imposition of the death penalty. With regard to his case, he specifically asserts that the trial court, rather than the jury, made findings of fact as to which aggravating and mitigating circumstances existed; that the trial court, rather than the jury, determined that the aggravating circumstances outweighed the mitigating circumstances; that the jury did not agree unanimously on the existence of the two aggravating circumstances; and that the jury did not unanimously find that the aggravating circumstances outweighed the mitigating circumstances.
In Ex parte Waldrop, 859 So.2d 1181, 1187-88 (Ala.2002), the Alabama Supreme Court explained:
"It is true that under Alabama law at least one statutory aggravating circumstance under Ala.Code 1975, § 13A-4-49, must exist in order for a defendant convicted of a capital offense to be sentenced to death. See Ala.Code 1975, § 13A-5-45(f) (`Unless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole.'); Johnson v. State, 823 So.2d 1, 52 (Ala.Crim.App.2001) (holding that in order to sentence a capital defendant to death, the sentencer `"must determine the existence of at least one of the aggravating circumstances listed in [Ala. Code 1975,] § 13A-5-49"' (quoting Ex parte Woodard, 631 So.2d 1065, 1070 (Ala.Crim.App.1993))). Many capital offenses listed in Ala.Code 1975, § 13A-5-40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A-5-49:

*459 "`For example, the capital offenses of intentional murder during a rape, § 13A-5-40(a)(3), intentional murder during a robbery, § 13A-5-40(a)(2), intentional murder during a burglary, § 13A-5-40(a)(4), and intentional murder during a kidnapping, § 13A-5-40(a)(1), parallel the aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged . . . [in a] rape, robbery, burglary or kidnapping," § 13A-5-49(4).'
"Ex parte Woodard, 631 So.2d at 1070-71 (alterations and omission in original).
"Furthermore, when a defendant is found guilty of a capital offense, `any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.' Ala.Code 1975, § 13A-5-45(e); see also Ala.Code 1975, § 13A-5-50 (`The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'). This is known as `double-counting' or `overlap,' and Alabama courts `have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.' Ex parte Trawick, 698 So.2d 162, 178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim. App.1992).
"Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was `proven beyond a reasonable doubt.' Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Waldrop's case, the jury, and not the trial judge, determined the existence of the `aggravating circumstance necessary for imposition of the death penalty.' Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Therefore, the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require."
(Footnote omitted.)
Because the jury convicted the appellant of the capital offense of robbery-murder, that statutory aggravating circumstance was proven beyond a reasonable doubt. Therefore, in this case, the jury, and not the judge, determined the existence of the "aggravating circumstance necessary for imposition of the death penalty." Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Further, because the jury found the existence of one aggravating circumstance, the appellant was exposed to or eligible for the death penalty, and "[t]he trial court's subsequent determination that the murder[ was] especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances." Waldrop, 859 So.2d at 1190. Accordingly, there was not a Ring violation in this case, and the appellant's arguments to the contrary are without merit.

B.
Second, the appellant contends that "[n]o reliable factfinding of aggravation *460 is determined by the jury in Alabama when the jury is instructed that its verdict and findings are advisory." (Appellant's brief at p. 88.) We addressed and rejected a similar argument in Duke v. State, 889 So.2d 1, 43 (Ala.Crim.App.2002), sentence vacated on other ground, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005), as follows:
"Duke also argues that Ring requires penalty-phase relief when the jury is told that its verdict is `advisory' or merely a `recommendation.' Contrary to Duke's contention, Ring does not address the advisory nature of a jury's sentencing recommendation. Duke's jury was properly informed that under Alabama law, its verdict was an advisory one. See § 13A-5-46, Ala.Code 1975. Thus, the jury was not misled regarding its role in the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)."
Therefore, the appellant's argument is without merit.

C.
Third, the appellant contends that the indictment against him was defective because it did not set forth the aggravating circumstances upon which the State intended to rely. We addressed and rejected a similar argument in Stallworth v. State, 868 So.2d 1128, 1186 (Ala.Crim.App. 2001), as follows:
"Stallworth also argues, in relation to the Ring issue, that his indictment was void because it failed to include in the indictment the aggravating circumstances the State intended to prove. In Poole v. State, 846 So.2d 370 (Ala.Crim. App.2001), we held that, although Apprendi required that the facts that increased a sentence above the statutory maximum must be submitted to a jury, those facts did not have to be alleged in the indictment. Recently, the Alabama Supreme Court adopted our holding in Poole. See Hale v. State, 848 So.2d 224 (Ala.2002).
"Also, the holdings in Poole and Hale are consistent with prior caselaw, which holds that aggravating circumstances do not have to be alleged in the indictment. See Ex parte Lewis, 811 So.2d 485 (Ala. 2001), and Dobard v. State, 435 So.2d 1338 (Ala.Crim.App.1982). Stallworth's argument is not supported by Alabama law."
(Footnote omitted.) Accordingly, the appellant's argument is without merit.

D.
Fourth, the appellant contends that "[s]tate and federal law now condemn the imposition of the death penalty by judge rather than a jury." (Appellant's brief at p. 90.)
"In several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State's argument that Ring did not invalidate Alabama's law, which vests the ultimate sentence determination in the hands of the trial judge, and not a jury. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002); Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App. 2001), opinion on return to second remand, 868 So.2d at 1178. In each of those cases, we recognized the narrowness of the holding in Ring, noting that `[t]he Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt'; however, we noted that the Ring Court `did not *461 reach the question whether judicial sentencing or judicial override was constitutional.' Stallworth v. State, 868 So.2d at 1183 (opinion on return to second remand). Indeed, we quote the following language from a footnote in Ring:

"`Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See Apprendi v. New Jersey, 530 U.S. 466, 490-491, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted [in Ring])). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) ("[I]t has never [been] suggested that jury sentencing is constitutionally required."). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S. at 477, n. 3, 120 S.Ct. 2348 (Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to `presentment or indictment of a Grand Jury'").'
"536 U.S. at 597 n. 4, 122 S.Ct. 2428 (emphasis added)."
Martin v. State, 931 So.2d 736, 756-57 (Ala.Crim.App.2003), aff'd in part, rev'd in part on other grounds, 931 So.2d 759 (Ala. 2004). Therefore, the appellant's argument is without merit.

E.
Fifth, the appellant contends that the Alabama Supreme Court's decision in Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002), "changed the legal effect of the jury's first phase verdict in violation of [his] rights under the Due Process Clause and the Sixth, Eighth, and Fourteenth Amendments." (Appellant's brief at p. 91.) Because he did not first present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
Section 12-3-16, Ala.Code 1975, provides:
"The decisions of the Supreme Court shall govern the holdings and decisions of the courts of appeals, and the decisions and proceedings of such courts of appeals shall be subject to the general superintendence and control of the Supreme Court as provided by Constitutional Amendment No. 328."
Because this court is bound by the decisions of the Alabama Supreme Court, we are not in a position to reverse that court's decision in Ex parte Waldrop.

XIV.
The appellant's fourteenth argument is that the prosecution's decision to seek the death penalty was impermissibly influenced by the victim's family. Because *462 he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
In an order that was entered on July 30, 2002, the trial court instructed the State to indicate, within 30 days, whether it intended to seek the death penalty in this case. On September 27, 2002, because the State had not responded to the trial court's order, the appellant filed a motion to preclude the State from seeking the death penalty. On October 15, 2002, the trial court entered an order that provided, in pertinent part, as follows:
"[T]he Defendant's Motion to Preclude the State from Seeking the Death Penalty is GRANTED; provided, the State may file with the Court a statement as to their reasons for not responding to the previous order of this Court, and whether or not the State is seeking the death penalty, and if so the specific factual basis for such penalty.
"The State shall be allowed ten (10) days in order to file such response. If no response is filed within that time, then this Order shall become final."
(C.R. 34.) In his response, the prosecutor asserted:
". . . The State apologizes to the Court for its failure to respond to this Court's order of July 29, 2002, to advise whether the death penalty was being sought. Any failure to do so was one of inadvertence, and not intended to slight this court or mislead the defense.
". . . Though the state has made clear to counsel for Defense from the preliminary hearing on that the death penalty would be sought, the family of Dorothy Epps was asked to meet with us to discuss their feelings prior to a formal response to the Order of July 29. Due to the heavy trial schedule of August (four trial weeks in five weeks), a meeting could not be arranged until September 12, 2002. At that meeting, they made clear their wish to seek the death penalty.
". . . Undersigned counsel was under the misimpression that the State's intention, long made clear to Defense counsel, was effectively communicated to the court in the September 16 hearing regarding Second Chair [defense counsel's] withdrawal. Though out of state for the hearing, I spoke to [another prosecutor] who indicated that a formal response was not specifically requested or made. I inferred that all present were aware of the state's intention from the fact that the prospect of the death penalty was often cited by [first chair defense counsel] as a reason for the Court to allow [second chair defense counsel] to continue as counsel.
". . . The State was not aware that the Court, or counsel for the defense needed clarification until its receipt of the `Motion to Preclude' September 30 and the Court's latest Order, received yesterday.
". . . The State is seeking the death penalty in this case.
". . . As for the factual basis for such penalty, in his videotaped, Mirandized, confession to Investigator Dwight Edger, Defendant stated that he intended to rob Ms. Epps because he thought she would have money, and that he assaulted her with a claw hammer to effect that robbery. He added that he was not provoked in any manner, but merely lashed out. Such activity is not only capital murder but at the same time constitutes an aggravating circumstance. Coral v. State, 628 So.2d 954 (Ala.Crim. App.1992).
". . . Likewise, the report of autopsy for Dorothy Crovatt Epps shows that this 75 year-old woman suffered multiple contusions and lacerations to her arms, forearms, and hands, with a fracture of *463 the left distal radius. She also suffered contusions in the face, neck, upper back and lower extremities, which included contusions in the chest with bilateral anterior rib fractures and contusions in the right atrium and right ventricle of her heart as well as contusions in the right back with fractures of the right 10th, 11th, and 12th ribs. As well, she had multiple contusions and lacerations of the scalp with multiple depressed skull fractures. A murder especially heinous, atrocious or cruel is an aggravating circumstance."
(C.R. 30-31.) Finally, in an order that was entered on October 21, 2002, the trial court set aside its order granting the appellant's motion to preclude and indicated that it would allow the State to seek the death penalty if the appellant was subsequently convicted of capital murder.
The record does not support the inference that the wishes of the victim's family impermissibly influenced the State's decision to seek the death penalty in this case. Rather, it appears that the State had previously indicated its intent to seek the death penalty, based on the circumstances of the offense, before consulting with the victim's family. It further appears that defense counsel was well aware of that intent because defense counsel indicated that the State was seeking the death penalty in this case in a notice of withdrawal of counsel due to a conflict of interest that was filed on August 23, 2002; in a motion to reconsider and demand for an in camera hearing that was filed on August 26, 2002; and in a demand for an in camera hearing that was filed on August 26, 2002. The meeting with the victim's family appears to have been more of a formality before responding to the trial court's order than a time to decide whether to seek the death penalty. Accordingly, we do not find that there was any error, much less plain error, in this regard.

XV.
The appellant's fifteenth argument is that the cumulative effect of all of the above-referenced allegations of error deprived him of due process, a fair trial, and a reliable sentencing. We have considered each of the allegations of error individually, and we have not found that any of those allegations of error require reversal. We have also considered the allegations of error cumulatively, and we do not find that "the accumulated errors have `probably injuriously affected [the appellant's] substantial rights.'" Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.). Therefore, the appellant's argument is without merit.

XVI.
Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of the appellant's conviction and sentence of death. The appellant was indicted for and convicted of capital murder because he committed the murder during the course of a robbery. See § 13A-5-40(a)(2), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved two aggravating circumstances: 1) the appellant committed the capital offenses while he was engaged in the commission of a first-degree robbery or an attempt thereof, see § 13A-5-49(4), Ala. Code 1975, and 2) the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial *464 court found that one statutory mitigating circumstance existedthe appellant did not have a significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975. It also made the following findings as to nonstatutory mitigating circumstances:
"The Court has also considered all aspects of the Defendant's character and record, and any of the circumstances of the offense that the Defendant has offered in mitigation. Specifically, the Court has considered the family background of the Defendant, the troubles that he has had as a result of his use of alcohol and illegal drugs, the possibility that he has a physiological dependency on alcohol, and illegal drugs. The Court has also taken into consideration the fact that the Defendant has been productive in the work force, that he obtained his GED after having failed to complete high school, and that he has accomplished those things notwithstanding his alcohol and drug abuse."
(C.R. 275.) The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant committed murder during the course of a robbery. Similar crimes are being punished by death throughout this state. See Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997); Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997); Peoples v. State, 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. See Rule 45A, Ala. R.App. P.
Accordingly, we affirm the appellant's conviction and sentence.
AFFIRMED.
McMILLAN, P.J., and WISE, J., concur; SHAW, J., concurs in part and concurs in the result in part, with opinion; COBB, J., concurs in part and dissents in part, with opinion.
SHAW, Judge, concurring in part and concurring in the result.
The main opinion holds:
"Because this case does not involve DNA evidence, the Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),] standard does not apply. Also, because print identification involves subjective observations and comparisons based on the expert's training, skill, or experience, we conclude that it does not constitute scientific evidence and that, therefore, Frye [v. United States, 293 F. 1013 (D.C.Cir.1923),] does not apply. Rather, print identification constitutes specialized knowledge that may be helpful to the jury in understanding or determining the facts. *465 Therefore, Rule 702, Ala. R. Evid., governs the admissibility of Lamont's testimony."
Based on this holding, with which I agree, I find it unnecessary to express an opinion as to whether Lamont's testimony would be admissible under Daubert. With that exception, I concur in the main opinion.
COBB, Judge, concurring in part and dissenting in part.
The majority affirms James Barber's conviction for the capital offense of murder committed during the course of a robbery and his sentence of death. I concur with the majority's resolution of all issues except its determination in Part I.B. that the State's failure to preserve the bloody palm print was not plain error. Although Barber failed to raise this issue at trial and addressed it fully only in his reply brief and at oral argument before this Court, the argument raises a potentially serious due-process issue that should be examined further. Because the bloody palm print on the countertop in the Eppses' house was the only physical evidence connecting Barber to this most serious of offenses, I believe this case should be remanded for a hearing before the trial court to determine whether the State violated its duty to preserve the evidence that it knew would rapidly degrade.
Having reviewed the videotape of Barber's confession, I am confident that no unacceptable techniques were used to obtain the confession. The integrity of the interrogation was apparent from the videotape. I am equally confident that Barber perpetrated this offense. As to the State's other main piece of incriminating evidencethe bloody palm print on the countertop, which was the only piece of physical evidence that linked Barber to this crimeI remain concerned that the State did not do all it should have done to preserve the evidence for examination by a defense expert.
In Ex parte Gingo, 605 So.2d 1237 (Ala. 1992), a case involving the disposal of test samples after they were analyzed but before the defendants had an opportunity to test them, the Alabama Supreme Court acknowledged the United States Supreme Court's holding in Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." The Court distinguished Youngblood, however, noting that the test results in the case under review were part of the State's case-in-chief and were necessary to satisfy the State's burden of proof. The Court also quoted Justice Stevens's special concurrence in Youngblood, noting:
"Although to show bad faith, for the purpose of showing a due process violation, the defendant must show that the State had knowledge of the exculpatory value of the destroyed evidence, `there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.' Youngblood, 488 U.S. at 67, 109 S.Ct. at 342 (Stevens, J., concurring in the result). We think that this is such a case."
Ex parte Gingo, 605 So.2d at 1241. The Court held that the trial court had correctly suppressed the evidence of the test results because the defendants had been denied access to evidence that was potentially exculpatory.
This Court later analyzed the decision in Ex parte Gingo and determined that the Alabama Supreme Court appeared to have joined a growing number of jurisdictions *466 that employed a balancing of three factorsculpability, materiality, and prejudice to the defendantin evaluating whether the State's loss or destruction of evidence constituted a due-process violation. Gurley v. State, 639 So.2d 557, 567 (Ala.Crim.App.1993). We stated:
"We conclude that our Supreme Court has adopted in theory, if not in name, a multi-factor balancing test similar to the one used by the Delaware court in Hammond [v. State, 569 A.2d 81, 87 (Del. 1989),] to determine whether the State's loss or destruction of evidence constitutes a due process violation in any given case. We also conclude that that balance will necessarily be drawn differently in every case because `fundamental fairness, as an element of due process, requires the State's failure to preserve evidence that could be favorable to the defendant "[t]o be evaluated in the context of the entire record."' Hammond, 569 A.2d at 87 (quoting United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976))(emphasis added)."
Gurley v. State, 639 So.2d at 567.
In Gurley, we reversed the appellant's conviction for robbery-murder because the State lost the only piece of physical evidence, the remnants of what was purportedly the victim's wallet, that had been removed from a barbeque pit in the backyard of a house belonging to an accomplice's mother. We applied the multi-factor balancing test and determined that Gurley had been prejudiced because he could not test the burned remnants to determine whether they were the remnant of a billfold and, if so, whether that billfold had belonged to the victim. We also determined that, even though the State's entire case did not depend on the evidence as was the case in Ex parte Gingo, the evidence was highly material because it was the alleged theft of the wallet that elevated the crime to capital murder. The record contained nothing regarding the State's culpability for the loss. Nonetheless, we held: "Because the charred object found in the firepit was highly material and because the admission of secondary evidence about that charred object was extremely prejudicial, we conclude that the appellant is entitled to a new trial." Gurley v. State, 639 So.2d at 569.
The majority failed to apply the multi-factor balancing test. Applying that test requires, at a minimum, that the case be remanded. The bloody palm print was vital to the State's case, and its admission was unquestionably prejudicial to Barber. The final factor, culpability of the State for the loss of the evidence, was not resolved by the testimony at trial. Although the fingerprint expert testified that the investigator "left it on the surface. There's not much else they could have done to it there" (R. 809), it is unclear whether the evidence could have been preserved in the laboratory by some process before it degraded, but that the process was not performed. The fingerprint expert also testified that he had been taught that it was good practice to photograph a print so that it could be maintained and used in court; he did not do so because it was not his case and he had been requested only to make a comparison. (R. 807.) Whether another member of the investigative team had the responsibility to photograph the palm print with a high quality digital camera so that its details could be examined later but failed to fulfill that obligation is not apparent from the record.
A bloody palm print on a nonporous surface is, obviously, a piece of evidence that will rapidly degrade and that should be preserved, at a minimum through a high quality photograph. Months, and sometimes years, often pass from the time *467 evidence is obtained by the State until a charge is filed, an attorney is appointed for an indigent defendant, discovery is obtained, and a defense expert is retained to examine the evidence. The duty to preserve the palm print seems obvious here, and yet it was not preserved, even by means of a photograph. Whether the State breached its duty is relevant information here, and I believe that the case should be remanded to resolve that issue. If the State was culpable, the balance of the factors here might weigh in favor of Barber, and admission of the evidence might have been plain error. This determination can only be made at a hearing by the trial court, however. Therefore, I believe that the case should be remanded for this limited purpose. As to this issue, I must dissent.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The record on appeal does not include these documents.
[3] We have reviewed the portion of the countertop that was introduced into evidence, and we note that, even today, some portions of the bloody palm print are clearly visible.